**CRYPTOWATT INVESTMENT
PARTNERS, LLC**

**LIMITED LIABILITY COMPANY
OPERATING AGREEMENT**

THIS LIMITED LIABILITY COMPANY OPERATING AGREEMENT of CrytpoWatt Investment Partners, LLC f/k/a BitPower Investment Partners, LLC (the "**Company**"), a Delaware limited liability company, dated as of October 1, 2018, is by and among the Company and the Persons executing this Agreement as Members.

## RECITALS

**WHEREAS**, the Company was formed as a limited liability company under the laws of the State of Delaware by the filing on December 1, 2017 of Certificate of Formation (the "**Certificate of Formation**") with the Secretary of State of the State of Delaware;

**WHEREAS**, the Company filed a Certificate of Amendment with the Secretary of State of the State of Delaware on January 30, 2018 to change its name to "CryptoWatt Investment Partners, LLC".

**WHEREAS**, the Company and the Members entered into that certain Contribution Agreement dated as of May 10, 2018 (as amended by that certain Amendment to the Contribution Agreement dated as of June 8, 2018, the "**Contribution Agreement**"), pursuant to which, among other things, the Members agreed that the terms set forth in Section 1 and Section 2 of the Contribution Agreement constitute the limited liability company agreement of the Company until such time as the Members execute a definitive limited liability company agreement (Section 1 and Section 2 of the Contribution Agreement, collectively, hereinafter referred to as the "**Interim Operating Agreement**");

**WHEREAS**, the Company and the Members now wish to enter into this Agreement, which shall replace in its entirety the Interim Operating Agreement;

**NOW, THEREFORE**, in consideration of the mutual covenants herein expressed and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS

1.01    <u>Definitions</u>. The defined terms used in this Agreement shall have the meanings specified below:

"**Accountants**" means such firm of independent certified public accountants as may be engaged by the Managing Member.

"**Act**" means the Delaware Limited Liability Company Act, Section 18-101, *et seq.*, as it may be amended from time to time and any successor to said law.

"**Additional Securities**" has the meaning set forth in Section 3.03.

"**Adjusted Capital Account**" means the balance in the Capital Account maintained for each

DocuSign Envelope ID: 864344BE-FF75-4C2A-9A72-7D65C3EA8A76

Member as of the end of each fiscal year as adjusted under Section 3.04 hereof, and further (i) increased by any amounts which such Member is obligated to restore pursuant to any provision of this Agreement or is treated as being obligated to restore pursuant to Treasury Regulations Section 1.704-1(b)(2)(ii)(c) or is deemed to be obligated to restore pursuant to the penultimate sentences of Treasury Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5) and (ii) decreased by the items described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), and 1.704-1(b)(2)(ii)(d)(6). The foregoing definition of Adjusted Capital Account balance is intended to comply with the provisions of Treasury Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

"**Affiliate**" means, with respect to a specified Person, (i) any Person that directly or indirectly controls or is controlled by or is under common control with the specified Person, and (ii) any Person that is a director, officer, of, general partner in or trustee of, or serves in a similar capacity with respect to, the specified Person or of which the specified Person is a director, officer, general partner or trustee, or with respect to which the specified Person serves in a similar capacity.

"**Agreement**" means this Limited Liability Company Operating Agreement (including all Exhibits and Schedules attached hereto), as originally executed and as amended, modified, supplemented or restated from time to time, as the context requires.

"**Applicable Law**" means all applicable laws, rules, ordinances, regulations and orders of any governmental or regulatory authority of competent jurisdiction.

"**Assign**" or "**Assignment**" has the meaning set forth in Section 8.04.

"**Capital Account**" has the meaning set forth in Section 3.04.

"**Capital Contribution**" means the amount of cash contributed to the Company by a Member as the consideration for such Member's interest in the Company pursuant to Article III. Any reference in this Agreement to the Capital Contribution of a then Member shall include a Capital Contribution previously made by any prior Member with respect to the interest of such then Member in the Company.

"**Certificate of Formation**" has the meaning set forth in the Recitals.

"**Change of Control**" means (1) a sale of all or substantially all of the Company's assets, (2) a merger, consolidation or other capital reorganization or business combination transaction of the Company with or into another corporation, limited liability company or other entity, or (3) the consummation of a transaction, or series of related transactions, in which any "person" (as such term is used in Sections 13(d) and 14(d) of the Exchange Act) becomes the "beneficial owner" (as defined in Rule 13d-3 of the Exchange Act), directly or indirectly, of a majority of the Company's then-outstanding voting securities. Notwithstanding the foregoing, a transaction shall not constitute a Change of Control if its purpose is to (A) change the jurisdiction of the Company's incorporation, (B) create a holding company that will be owned in substantially the same proportions by the persons who hold the Company's securities immediately before such transaction, or (C) obtain funding for the Company in a financing that is approved by the Company's Managing Member.

"**Code**" means the Internal Revenue Code of 1986, as amended from time to time.

"**Company**" means CryptoWatt Investment Partners, LLC.

"**Consent**" means the approval of a Person, or a specified group of Persons, to do the act or thing for which the approval is solicited, or the act of granting such approval, as the context may require.

"**Distribution**" means each distribution made by the Company to a Member, whether in cash,

property or securities of the Company and whether by liquidating distribution, redemption, repurchase, or otherwise; provided, that any recapitalization or exchange or conversion of Securities of the Company, redemption or repurchase of Securities of the Company, and any subdivision (by Unit split or otherwise) or any combination (by reverse Unit split or otherwise) of any outstanding Units shall not be deemed a Distribution.

"**Exercise Notice**" means written notice from the Company notifying the selling Members that the Company intends to exercise its Right of First Refusal as to some or all of the Units with respect to any Proposed Member Transfer.

"**Indemnified Party**" means each of the following: (i) the Managing Member, the officers of the Company, and the liquidator of the Company; (ii) each manager or managing member of any of the foregoing; (iii) each director, officer, stockholder, partner, member, employee, agent, legal counsel, representative and incorporator of any of the foregoing; (iv) trustees of any of the foregoing; (v) controlling persons or Affiliates of any of the foregoing; and (vi) successor, assigns and personal representatives of any of the foregoing.

"**Insured Party**" has the meaning set forth in Section 5.10(c).

"**Managing Member**" has the meaning set forth in Section 5.01.

"**Members**" means the Persons admitted to the Company and identified as Members on Schedule A attached hereto, and any Person subsequently admitted to the Company as a Substitute Member or additional Member in accordance with the terms of this Agreement (including, without limitation, Article VIII), so long as they remain Members, and "**Member**" means any of the Members, in each such Person's capacity as a Member. The Percentage Interests, names and addresses of the Members are as set forth on Schedule A hereto, as the same may be amended from time to time in accordance with the terms of this Agreement.

"**Net Distributable Cash**" has the meaning set forth in Section 4.01.

"**Net Loss**" shall mean, for each fiscal year, the excess, if any, of the Company's items of deduction and loss over the Company's items of income and gain, in each case computed under the method of accounting for maintaining Capital Accounts in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv).

"**Net Profits**" shall mean, for each fiscal year, the excess, if any, of the Company's items of income and gain over the Company's items of deduction and loss, in each case computed under the method of accounting for maintaining Capital Accounts in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv).

"**Percentage Interest**" shall mean for each Member at any particular time, the percentage obtained by dividing the number of Units then owned by such Member by the total number of Units then owned by all Members.

"**Permitted Transferee**" has the meaning set forth in Section 8.03 hereof.

"**Person**" means any individual, general partnership, limited partnership, limited liability partnership, limited liability company, corporation, joint venture, trust, business trust, cooperative, association or other person or entity, and the heirs, executors, administrators, legal representatives, successors and assigns of such Person when the context so permits.

"**Profits Interest**" means a "profits interest" within the meaning of IRS Revenue Procedure 93-27.

"**Proposed Member Transfer**" means any Assignment or any other like transfer or encumbering of any Units (or any interest therein) proposed by any Member.

"**Proposed Transfer Notice**" means written notice from a Member setting forth the terms and conditions of a Proposed Member Transfer.

"**Prospective Transferee**" means any Person to whom a Member proposes to make a Proposed Member Transfer.

"**Purchasing Member**" means a Member exercising a Right of First Refusal pursuant to Article VIII.

"**Right of First Refusal**" means the right, but not the obligation, of the Company, or its permitted transferees or assigns, to purchase some or all of the Units with respect to a Proposed Member Transfer, on the terms and conditions specified in the Proposed Transfer Notice.

"**Safe Harbor Rules**" has the meaning set forth in Section 7.05.

"**Securities**" has the meaning set forth in Section 2.08.

"**Substitute Member**" means an assignee of a Unit who is admitted as a Member of the Company pursuant to and in accordance with the terms of this Agreement.

"**Target Capital Account**" shall mean the Capital Account of a Member as of the end of each fiscal year, increased by any amount that such Member is obligated to restore under this Agreement, is treated as obligated to restore under Treasury Regulations Section 1.704-1(b)(2)(ii)(c), or is deemed obligated to restore under the penultimate sentences of Treasury Regulations Section 1.704-2(g)(1) and (i)(5).

"**Treasury Regulations**" means regulations promulgated under the Code, as in effect from time to time.

"**Unit**" means a limited liability company interest in the Company held by a Member. The number of Units held by each Member are set forth on Schedule A hereto, as it may be amended from time to time in accordance with the terms of this Agreement.

"**Unreturned Capital**" of any Unit means, as of any date, the aggregate Capital Contributions made or deemed to be made in exchange for such Unit reduced by all Distributions made by the Company that constitute a return of Unreturned Capital under Section 4.01(a)(i).

1.02    Singular/Plural; Gender, Etc. In the case of all terms used in this Agreement, the singular shall include the plural, and the masculine gender shall include the feminine and neuter, and vice versa, as the context requires.

## ARTICLE II
## GENERAL PROVISIONS

2.01    Formation of the Company. The parties confirm the formation of the Company as a limited liability company pursuant to the provisions of the Act. Except as expressly provided herein, the

rights and obligations of the Members and the Managing Member and the administration and termination of the Company shall be governed by the Act. The Managing Member shall cause to be filed such certificates and documents as appropriate to comply with the applicable requirements for the operation of a limited liability company in accordance with the Applicable Laws of each jurisdiction in which the Company shall conduct business from time to time.

2.02    Name of the Company. The name of the Company shall be "CryptoWatt Investment Partners, LLC" or such other name as the Managing Member may from time to time determine. The Managing Member shall cause to be filed on behalf of the Company such business, assumed or fictitious name or foreign qualification certificate or certificates as may from time to time be required by Applicable Law.

2.03    Purposes of the Company. The purposes for which the Company is formed is to (i) generate capital appreciation and/or income through a series of passive and/or control investments; and (ii) engage in any other lawful act or activity for which a limited liability company may be formed pursuant to the Act.

2.04    Place of Business of the Company. The principal place of business of the Company shall be located at such location as the Managing Member may determine. At any time and from time to time, the Managing Member may change the location of the Company's principal place of business upon written notice of such change to the Members and may establish such other place or places of business as and when necessary or appropriate to the business of the Company and in furtherance of its purposes as set forth in Section 2.03.

2.05    Duration of the Company. The Company shall be perpetual and shall continue in existence until terminated in accordance with Article X hereof.

2.06    Scope of Members' Authority. Except as expressly provided for in this Agreement, no Member shall have any authority to act for, hold himself or itself out as the agent of, or assume any obligation or responsibility on behalf of, any other Member or the Company.

2.07    Title to Company Property. All property owned by the Company, whether real or personal, tangible or intangible, shall be deemed to be owned by the Company as an entity, and no Member, individually, shall have any ownership of such property. The Company may hold any of its assets in its own name or in the name of its nominee, which nominee may be one or more individuals, partnerships, trusts or other entities.

2.08    Securities Subject to this Agreement. Each of the Members expressly agrees that the terms and restrictions of this Agreement shall apply to all Units, other equity interests of the Company and rights thereto (collectively, "**Securities**") which any of them now owns or hereafter acquires by any means, including, without limitation, by purchase, Assignment or operation of law, or as a result of any dividend or distribution, split, reorganization, reclassification, whether voluntary or involuntary, or other similar transaction, and to any Units, shares of stock, membership interests, other equity interests or rights thereto of any successor-in-interest of the Company, whether by sale, merger, consolidation or other similar transaction, or by purchase, Assignment or operation of law hereafter owned or acquired by any of them or their respective transferees or successors-in-interest.

2.09    No Partnership Relationship. Notwithstanding, but not in limitation of, any other provision of this Agreement, the parties understand and agree that the creation, management and operation of the Company shall not create or imply a general partnership or joint venture between or among the Members, and shall not make any Member the agent or partner of any other Member for any purpose.

2.10     <u>Limitation of Liability</u>. Each Member's liability shall be limited as set forth in this Agreement, the Act, and other Applicable Law. Except to the extent required by the Act, no Member shall be personally liable for any debts, obligations, liabilities or losses of the Company.

2.11     <u>List of Members</u>. Upon written request of any Member, the Managing Member shall provide or cause to be provided a list showing the names and addresses of, and the number(s) of Units

and the Percentage Interests then held by, each of the Members.

## ARTICLE III

## UNITS; VOTING RIGHTS; CAPITAL ACCOUNTS;
## ALLOCATIONS OF PROFITS AND LOSSES

3.01    Units; Voting Rights and Obligations.

(a)  The authorized membership interests of the Company shall consist of up to 10,000,000 Units. The issued Units as of the date of this Agreement are as set forth on Schedule A hereto.

(b)  Except as otherwise provided in this Agreement or the Act, all Units shall vote together as a single class. Except as otherwise provided in this Agreement, holders of record of Units are entitled to one vote per Unit held on all matters as to which such Members are entitled to vote.

3.02    Capital Contributions; No Withdrawal Rights.

(a)  Each Member has made one or more Capital Contributions to the Company in the aggregate amount set forth opposite such Member's name under the heading "Capital Contribution" on Schedule A hereto.

(b)  No interest shall accrue on any contributions to the capital of the Company, and no Member shall have the right to withdraw or to be repaid any capital contributed by such Person to the Company or to receive any other payment in respect of such Person's interest in the Company (including, without limitation, upon withdrawal from the Company), except as specifically provided in this Agreement.

3.03    Issuance of Additional Units and Interests.

(a)    Subject to compliance with the provisions of this Agreement, the Managing Member shall have the right to cause the Company to authorize, designate, issue or sell to any Person (including Members and Affiliates) any of the following (which for purposes of this Agreement shall be "**Additional Securities**"), without the Consent of any Member: (i) additional Units or other interests in the Company, (ii) obligations, evidences of indebtedness, or other securities or interests convertible or exchangeable into Units or other interests in the Company, and (iii) warrants, options, or other rights to purchase or otherwise acquire Units or other interests in the Company. Subject to the provisions of this Agreement, the Managing Member shall determine the terms and conditions governing the issuance of such Additional Securities, including the number and designation of such Additional Securities, the designations, preferences (with respect to distributions, liquidations, voting rights, or otherwise) over any other Units, any restrictions, vesting requirements, contingencies, repurchase rights, or forfeiture provisions, any designation of such Additional Securities as Profits Interests, and relative, participating, optional or other special rights, powers and duties, including rights, powers and duties senior or junior to, or *pari passu* with, any other Units, and any required contributions in connection therewith.  Notwithstanding the foregoing, the Managing Member will not be permitted to issue Additional Securities without the Consent of each Member hereto if the per Unit price proposed for any such issuance is below the per Unit price determined by dividing the aggregate Capital Contributions set forth on Schedule A by the total number of outstanding Units set forth on Schedule A.

(b)    In the event that the Company proposes to issue any Additional Securities, the Managing Member shall cause the Company to deliver to each Member a notice of such proposed issuance (the "**Notice of Proposed Issuance**"), which shall specify (i) the type and number of Units or other interests in the Company proposed to be issued, (ii) the purchase price per Unit or interest, the use to which the

proceeds of such Units or interests is intended to be put, and (iv) the material terms and conditions of such proposed issuance.

(c)     Each Member shall then have the right to purchase all (or any portion) of his "*pro rata portion*" (as defined below) of such Units or other interests in the Company as are proposed to be issued, at the price and on the terms and conditions contained in the Notice of Proposed Issuance. A Member's "*pro rata portion*" shall equal a fraction, the numerator of which is the number of Units then held by such Member and the denominator of which is the total number of Units then issued and outstanding. The rights set forth in Section 3.03(b) and (c) shall not apply to Exempted Securities, and shall be exercised by a Member, if at all, by written notice to the Company delivered not later than five (5) business days after the receipt by such Member of the Notice of Proposed Issuance in accordance with the terms and conditions stated therein. Any such purchase by such Members shall be at the price and on the terms upon which such Units or other interests in the Company are purchased by the other purchasers of such Units or other interests in the Company.

For purposes of this Agreement, "**Exempted Securities**" shall mean: (i) Units or other interests (including Profits Interests) issued to employees, managers, consultants or advisors of the Company pursuant to a plan, agreement or other arrangement approved by the Managing Member pursuant to Section 3.03(a), (ii) Units or other interests (including Profits Interests) issued to banks, equipment lessors or other financial institutions, pursuant to a debt financing or equipment leasing transaction approved by the Managing Member, or (iii) Units or other interests (including Profits Interests) issued pursuant to the acquisition of another company by the Company by merger, purchase of substantially all of the assets or other reorganization or to a joint venture agreement; provided, that such transaction(s) are approved by the Managing Member.

3.04     Capital Accounts.

(a)  A separate capital account shall be maintained for each Member (each a "**Capital Account**") in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv). The Capital Account of each Member shall be: (i) increased by contributions of money or property by the Member to the Company and allocations of income or gain; (ii) decreased by distributions of money or property by the Company to the Member and allocations of loss or deduction; and (iii) otherwise adjusted in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv). The Managing Member may modify the manner in which Capital Accounts are computed as it deems necessary to comply with Code Section 704(b) and the Treasury Regulations thereunder; provided, that such modifications shall not have a material effect on the amounts distributable to any Member under this Agreement.

(b)  The Company may, at the discretion of the Managing Member, revalue Company property as permitted under Treasury Regulations Section 1.704-1(b)(2)(iv)(f). In the event of such a revaluation, the Capital Accounts of the Members shall be adjusted in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(f) and (g).

3.05     Allocations of Profits and Losses. Subject to Sections 3.06 through 3.09 below, for each fiscal year, the Company's Net Profits or Net Loss shall be allocated among the Members in such a manner that, immediately after giving effect to such allocations, each Member's Target Capital Account balance, taking into account all cash contributions by such Member and distributions to such Member, equals, as nearly as possible, the amount of cash, if any, that would be distributed to such Member if (i) all the Company's assets were sold for cash equal to their respective book values (as determined under Treasury Regulations Section 1.704-(b)(2)(iv)), reduced, but not below zero, by the amount of nonrecourse debt to which such assets are subject, (ii) all the Company's liabilities (other than nonrecourse liabilities) were paid in full, and (iii) all the remaining cash were distributed to the Members in accordance with the order of priority set forth in Section 4.01.

3.06    Nonrecourse Deductions, Tax Credits, Etc. Nonrecourse deductions (within the meaning of Treasury Regulations Section 1.704-2(b)(1)), tax credits, and other items the allocation of which cannot have economic effect shall be allocated to the Members in accordance with the Members' interests in the Company, which, unless otherwise required by the Code and Treasury Regulations, shall be in accordance with Percentage Interests.

3.07    Section 704(b) Regulatory Allocations. The provisions of the Treasury Regulations under Code Section 704(b) relating to qualified income offset, minimum gain chargeback, minimum gain chargeback with respect to partner nonrecourse debt, allocations of nonrecourse deductions, allocations with respect to partner nonrecourse debt, limitations on allocations of losses to cause or increase a Capital Account deficit, and forfeiture allocations with respect to substantially non-vested partnership interests are hereby incorporated by reference and shall be applied to the allocation of income, gain, loss, or deduction in the manner provided in the Treasury Regulations. The Managing Member may, in its discretion, adjust the subsequent allocations of income, gain, losses, or deduction to prevent distortion of the economic arrangement of the Members, otherwise described in this Agreement, due to allocations resulting from the preceding sentence.

3.08    Tax Allocations; Section 704(c).

(a)    Except as otherwise provided below or as otherwise required by the Code or Treasury Regulations, a Member's distributive share of items of income, gain, loss, and deduction for income tax purposes shall be the same as is entered in the Member's Capital Account pursuant to this Agreement. A Member's distributive share shall be deemed to consist of a pro rata portion of each item of income, gain, loss, or deduction required to be separately stated under Code Section 702(a).

(b)    In accordance with Code Section 704(c) and the Treasury Regulations thereunder, and in such a manner as is determined by the Managing Member, allocations of items of income, gain, loss, or deduction for income tax purposes shall take into account any variation between the adjusted tax basis of Company property and the book value of such property as determined for purposes of maintaining Capital Accounts.

3.09    Transfer or Change of Interest. If any interests in the Company are newly issued, reserved, transferred, forfeited, or redeemed during a fiscal year, the Managing Member shall adjust allocations of income, gain, loss, deduction, and credit to take account of the varying interests of the Members in any manner consistent with Code Section 706 and the Treasury Regulations thereunder.

3.10    Drag-Along Rights.

(a)    In the event that the Managing Member approves a transaction involving (1) the sale, lease, transfer, exclusive license or other disposition (in one or a series of related transactions) of all or substantially all of the Company's assets to one or more third parties acting in concert that are not Affiliates of the Company, or Affiliates of any of the Members ("**Proposed Transferee**"), (2) any sale or transfer of the Units of the Company such that following said sale or transfer the Members, their Permitted Transferees and their respective Affiliates no longer collectively hold a majority of the outstanding Units; or (3) the merger or consolidation of the Company with or into another Proposed Transferee pursuant to which the holders of the outstanding Units immediately prior to such sale or transfer own less than a majority in voting rights of the Units, or equity securities of the surviving or resulting corporation or acquirer, as the case may be, immediately following such transaction (a "**Proposed Sale**"), then each Member and the Company hereby agree:

(i)    notwithstanding anything to the contrary contained herein, the Managing Member shall not approve a Proposed Sale unless all Members are allowed to participate in such

transaction on a pro rata basis and, in the event that the Proposed Sale involves the sale of all or substantially all of the Company's assets, the aggregate consideration received pursuant to such transaction by the Company and the Members collectively is allocated and distributed among the Members in accordance with Section 4.01 of this Agreement;

(ii)     if such Proposed Sale is a sale of Units of the Company or a merger or consolidation of the Company with or into another Person, then each Member shall have the right to sell or exchange, as the case may be, the same proportion of Units beneficially held by such Member as is being sold or exchanged by the other Members to the Person to whom the Members propose to sell or exchange their Units, and, except as permitted in Section 3.10(b) below, on the same terms and conditions as such other Members;

(iii)    to execute and deliver all related documentation and take such other action in support of such Proposed Sale as shall reasonably be requested by the Company or the Board in order to carry out the terms and provision of this Section 3.10 including, without limitation, executing and delivering instruments of conveyance and transfer, and any purchase agreement, merger agreement, indemnity agreement, escrow agreement, Consent, waiver, governmental filing, Unit certificates duly endorsed for transfer (free and clear of impermissible liens, claims and encumbrances), and any similar or related documents;

(iv)    not to deposit, and to cause their Affiliates not to deposit, except as provided in this Agreement, any Units owned by such party or Affiliate in a voting trust or subject any Units to any arrangement or agreement with respect to the voting of such Units, unless specifically requested to do so by the acquirer in connection with such Proposed Sale;

(v)     to refrain from exercising any dissenters' rights or rights of appraisal under Applicable Law at any time with respect to such Proposed Sale; and

(vi)    if the consideration to be paid in exchange for the Units pursuant to this Section 3.10 includes any securities and due receipt thereof by any Member would require under Applicable Law (x) the registration or qualification of such securities or of any Person as a broker or dealer or agent with respect to such securities; or (y) the provision to any Member of any information other than such information as a prudent issuer would generally furnish in an offering made solely to "accredited investors" as defined in Regulation D promulgated under the Securities Act, the Company may cause to be paid to any such Member in lieu thereof, against surrender of the Units which would have otherwise been sold by such Member, an amount in cash equal to the fair value (as determined in good faith by the Managing Member) of the securities which such Member would otherwise receive as of the date of the issuance of such securities in exchange for the Units.

(b)     Notwithstanding the foregoing, a Member will not be required to comply with Section 3.10(a) above in connection with any Proposed Sale unless:

(i)     any representations and warranties to be made by such Member in connection with the Proposed Sale are limited to representations and warranties related to authority, ownership and the ability to convey title to such Units, including, but not limited to, representations and warranties that (i) the Member holds all right, title and interest in and to the Units such Member purports to hold, free and clear of all liens and encumbrances, (ii) the obligations of the Member in connection with the transaction have been duly authorized, if applicable, (iii) the documents to be entered into by the Member have been duly executed by the Member and delivered to the acquirer and are enforceable against the Member in accordance with their respective terms; and (iv) neither the execution and delivery of documents to be entered into in connection with the transaction, nor the performance of the Member's obligations thereunder, will cause a breach or violation of the terms of any agreement, law or judgment, order or

DocuSign Envelope ID: 864344BE-FF75-4C2A-9A72-7D65C3EA8A76

decree of any court or governmental agency;

        (ii)     the Member shall not be liable for the inaccuracy of any representation or warranty made by any other Person in connection with the Proposed Sale, other than the Company (except to the extent that funds may be paid out of an escrow established to cover breach of representations, warranties and covenants of the Company as well as breach by any Member of any identical representations, warranties and covenants provided by all Members);

        (iii)    the liability for indemnification, if any, of such Member in the Proposed Sale and for the inaccuracy of any representations and warranties made by the Company or its Members in connection with such Proposed Sale, is several and not joint with any other Person (except to the extent that funds may be paid out of an escrow established to cover breach of representations, warranties and covenants of the Company as well as breach by any Member of any identical representations, warranties and covenants provided by all Members), and is pro rata in proportion to, and does not exceed, the amount of consideration paid to such Member in connection with such Proposed Sale; and

        (iv)    upon the consummation of the Proposed Sale each holder of Units will receive the same amount of consideration per Unit as is received by other holders in respect of their Units; provided, however, that, notwithstanding the foregoing, if the consideration to be paid in exchange for the Units, as applicable, pursuant to this Section 3.10(b)(iv) includes any securities and due receipt thereof by any Member would require under Applicable Law (x) the registration or qualification of such securities or of any Person as a broker or dealer or agent with respect to such securities; or (y) the provision to any Member of any information other than such information as a prudent issuer would generally furnish in an offering made solely to "accredited investors" as defined in Regulation D promulgated under the Securities Act, the Company may cause to be paid to any such Member in lieu thereof, against surrender of Units, which would have otherwise been sold by such Member, an amount in cash equal to the fair value (as determined in good faith by the Company) of the securities which such Member would otherwise receive as of the date of the issuance of such securities in exchange for the Units.

        (c)    <u>Covenants of the Company</u>.  The Company agrees to use its best efforts, within the requirements of Applicable Law, to ensure that the rights granted under this Agreement are effective and that the parties enjoy the benefits of this Agreement.

        (d)    <u>Irrevocable Proxy</u>.  Each party to this Agreement hereby constitutes and appoints as the proxies of the party and hereby grants a power of attorney to the Managing Member, with full power of substitution, with respect to the matters set forth herein, and hereby authorizes each of them to take any action necessary to effect Section 3.10 hereof. Each of the proxy and power of attorney granted pursuant to the immediately preceding sentence is given in consideration of the agreements and covenants of the Company and the parties in connection with the transactions contemplated by this Agreement and, as such, each is coupled with an interest and shall be irrevocable unless and until this Agreement terminates or expires pursuant to Article X, or this Section 3.10 is terminated in accordance with clause (g) below. Each party hereto hereby revokes any and all previous proxies or powers of attorney with respect to the Units and shall not hereafter, unless and until this Agreement terminates or expires pursuant to Article X, or this Section 3.10 is terminated in accordance with clause (g) below, purport to grant any other proxy or power of attorney with respect to any of the Units, deposit any of the Units into a voting trust or enter into any agreement (other than this Agreement), arrangement or understanding with any Person, directly or indirectly, to vote, grant any proxy or give instructions with respect to the voting of any of the Units, in each case, with respect to any of the matters set forth herein.

        (e)    Each party acknowledges and agrees that each party hereto will be irreparably damaged in the event that this <u>Section 3.10</u> is not performed by the parties in accordance with its specific terms or is otherwise breached.  Accordingly, it is agreed that each of the Company and the Members shall be

entitled to an injunction to prevent breaches of this Agreement, and to specific enforcement of this Agreement and its terms and provisions in any action instituted in any court of the United States or any state having subject matter jurisdiction.

(f)    <u>Remedies Cumulative</u>. All remedies, either under this Agreement or by law or otherwise afforded to any party, shall be cumulative and not alternative.

(g)    <u>Termination.</u> This <u>Section 3.10</u> shall automatically terminate upon the earlier of (a) immediately prior to the consummation of an initial public offering of the Company's securities and (b) the consummation of a Proposed Sale.

## ARTICLE IV
## DISTRIBUTIONS

4.01 <u>Distributions</u>.

(a)    <u>Distributions Generally</u>. After (x) the payment of expenses, and (y) the setting aside of reserves in such amounts as may be determined by the Managing Member, the Managing Member shall distribute cash ("**Net Distributable Cash**"), Section 4.01(b) (governing tax distributions) and Section 10.02 (governing distributions upon liquidation), to the Members of the Company as follows:

(i)    First, to each Member who has made Capital Contributions, in accordance with such Member's share of Unreturned Capital for such Member's Units, until such Member's Unreturned Capital for such Member's Units equals zero. No Distribution or any portion thereof may be made pursuant to Section 4.01(a)(ii) below until the sum of the entire amount of Capital Contributions with respect to the outstanding Units, determined as of the time of such Distribution, has been paid in full;

(ii)    Second, all remaining amounts shall be distributed to the Members holding Units, pro rata according to each Member's Percentage Interest immediately prior to such Distribution;

(b)    <u>Tax Distributions</u>. Prior to any Distribution under Section 4.01(a) above, the Company shall make reasonable best efforts to distribute Net Distributable Cash to each Member in an amount equal to the excess, if any, of (i) the highest combined federal and state marginal income tax rate applicable to an individual resident of Delaware multiplied by the Company's taxable net income allocated to (or reasonably estimated to be allocated to such Member for the current (or just completed) fiscal year, over (ii) prior Distributions to such Member during or with respect to such fiscal year. The Managing Member, in its sole discretion, may adjust Distributions to a Member pursuant to this Section 4.01 to take into account the type of income allocated and any previously allocated taxable losses that may offset later taxable income. Any payments to a recipient under this Section 4.01(b) shall be treated as an advance to such recipient to be reimbursed dollar-for-dollar from Distributions otherwise to be made to such recipient under this Agreement and shall represent a personal debt of such recipient to the Company.

(c)    <u>Tax Withholding</u>. The Company shall withhold from payments and distributions to a Member and remit to the appropriate government authority any amounts required to be withheld under the Code, Treasury Regulations, or state, local, or foreign tax law.  All amounts so withheld shall be treated as paid or distributed, as the case may be, to the Member for all purposes of this Agreement. Each Member hereby agrees to indemnify and hold harmless the Company from and against any liability with respect to income attributable to or distributions or other payments to such Member.  To the extent that the Code, Treasury Regulations, or state, local, or foreign tax law requires the Company to remit to a governmental authority an amount with respect to a Member that exceeds the amount then otherwise distributable to such Member, (i) the excess shall constitute a loan from the Company to such Member

which shall be payable upon demand and shall bear interest, from the date that the Company makes the payment to the relevant governmental authority, at the lesser of (A) the one-month LIBOR plus four percent (4%) or (B) the maximum legal interest rate under Applicable Law, compounded annually, (ii) the Company shall be entitled to collect such sum from amounts otherwise distributable to such Member under this Agreement, and (iii) the Company may exercise any and all rights and remedies to collect such sum from such Member that a creditor would have to collect a debt from a debtor under Applicable Law. Any payment made by a Member to the Company pursuant to this Section 4.01(c) shall not constitute a Capital Contribution.

(d) Distributions on Profits Interest. No distributions with respect to an interest intended to be a Profits Interest acquired in connection with the performance of services shall be made (including on a liquidation of the Company) to the extent such distribution would cause or increase a deficit in the holder's Adjusted Capital Account. Instead such undistributed amount shall be distributed to the Member only in the event and at such time as the distribution would no longer cause or increase such an Adjusted Capital Account deficit. This paragraph is intended to be applied in a manner so that such interest qualifies as a profits interest as described in IRS Revenue Procedure 93-27.

# ARTICLE V
# MANAGEMENT

5.01    Management of the Company. Except for the situations in which the Consent of certain Members is expressly required by this Agreement or by Applicable Law, the overall management and control of the business and affairs of the Company will be vested in Hard Fork Holdings, Inc. (the "**Managing Member**"). Subject to the provisions of this Agreement, the Managing Member shall have the full, exclusive and complete authority, power and discretion to manage, operate and control the business, affairs and properties of the Company, to make all decisions regarding those matters, to perform any and all other acts or activities customary or incident to the management of the Company's business and to do all things necessary or appropriate to carry on the business and purposes of the Company, and the Members shall have only the voting and other rights of representation specifically provided in this Agreement or by non-waivable provisions of Applicable Law. The Managing Member shall have all of the rights and powers of a "manager" under the Act and otherwise as provided by Applicable Law. No Person shall be entitled to be employed by the Company solely because such Person is also a Member of the Company.

5.02    The Managing Member may appoint officers or engage consultants to assist it with the day-to-day management of the business and affairs of the Company.

(a) Tenure and Qualifications. The Company may from time to time have as its officers a Chief Executive Officer, a President, one or more Vice Presidents, a Chief Financial Officer, a Secretary or Assistant Secretary and such other officers as the Managing Member may determine from time to time. All officers shall be appointed by and serve at the pleasure of the Managing Member. No officer need be a Member, and two or more offices may be held by any one Person. Each officer shall hold office until his or her successor is elected or appointed or qualified, or until such Person dies, resigns, is removed or becomes disqualified.

(b) Resignation, Removal and Vacancies. Any officer may resign by giving written notice of his resignation to the Managing Member, and such resignation shall become effective upon delivery of such notice unless a later time is specified therein. Any officer may be removed with or without cause by the Managing Member, and any vacancy in the position of any officer may be filled by the Managing Member.

(e) Duties of Officers. Subject to the control and direction of the Managing Member, the

officers of the Company shall have the powers and duties for such positions equivalent to those customarily attributed to such offices under the corporate law of the State of Delaware.

(f) <u>Compensation; Certain Expenses</u>. The salary and any other compensation of the officers of the Company and any Management Company shall be determined by the Managing Member. All reasonable and necessary expenses incurred by the Managing Member, any officer or Management Company in connection with the Company's Business, and in accordance with the Company's expense reimbursement policy in place from time to time, shall be reimbursed to such Person by the Company.

5.03   <u>Binding the Company; Authority of Others to Act</u>. Unless authorized to do so by this Agreement or in writing by the Managing Member or its designee (acting pursuant to due authorization under this Agreement), no attorney-in-fact, employee, or other agent of the Company shall have any power or authority to bind the Company in any way, to pledge its credit or to render it liable pecuniarily for any purpose. No Member shall have any power or authority to bind the Company unless the Member has been authorized by the Managing Member or this Agreement to act as an agent of the Company in accordance with the previous sentence. Any action taken by the Managing Member of the Company or by an officer as officer of the Company shall bind the Company and shall be deemed to be the action of the Company.

5.04   <u>Liability for Certain Acts</u>. The Managing Member and each officer shall perform his duties in good faith, in a manner reasonably believed by him to be in the best interests of the Company, and with such care as an ordinarily prudent natural person in a like position would use under similar circumstances. To the fullest extent permitted by Applicable Law, no Managing Member or officer of the Company who so performs his duties shall have any liability by reason of being or having been the Managing Member or officer of the Company. The Managing Member and officers do not, in any way, guarantee the return of the Members' Capital Contributions or a profit for the Members from the operations of the Company. No Managing Member or officer shall be liable to the Company or to any Member for any loss or damage sustained by the Company or any Member, unless the loss or damage shall have been the result of such Managing Member's or officer's fraud, deceit, gross negligence or willful misconduct against the Company.

5.05   <u>Managing Member and Officers Have No Exclusive Duty to the Company</u>. Except as otherwise provided in this Agreement or in any other agreement between the Company and a Managing Member or officer of the Company, (i) no Managing Member or officer shall be required to manage the Company as his sole and exclusive function, (ii) the Managing Member and each officer may have other business interests and may engage in other activities in addition to those relating to the Company, (iii) neither the Company nor any Member shall have any right, by virtue of this Agreement, to share or participate in such other investments or activities of a Managing Member or officer or to the income or proceeds derived therefrom, and (iv) no Managing Member or officer shall incur liability to the Company or to any of the Members as a result of engaging in any other business or venture.

5.06   <u>Indemnity of the Managing Member, Officers, Employees, and Other Persons</u>.

(a)   In the absence of fraud, willful misconduct or gross negligence, no Indemnified Party shall be liable to any Party hereto (i) for any mistake in judgment, (ii) for any action taken or omitted to be taken, including any action taken or omitted to be taken by the Indemnified Party, or (iii) for any loss due to the mistake, action, inaction, negligence, dishonesty, fraud or bad faith of any broker or other agent; provided, that such broker or other agent shall have been selected engaged or retained by the Indemnified Party with reasonable care. The Managing Member and each officer may consult with legal counsel and accountants in respect of Company affairs and shall be fully protected and justified in any action or inaction which is taken or omitted in good faith, in reliance upon and in accordance with the opinion or advice of such counsel or accountants.

14

(b)　　The Company shall, to the fullest extent permitted by Applicable Law, out of the Company's assets, indemnify and hold harmless each of the Indemnified Parties, and the Company may, in the sole discretion of the Managing Member, to the fullest extent permitted by Applicable Law, out of the assets of the Company, indemnify and hold harmless (i) employees and agents of the Company, (ii) officers and managers of subsidiaries of the Company, and (iii) any Person who serves at the request of the Company or the Managing Member on behalf of the Company as a managing member, advisor, officer, employee or agent of any subsidiary of the Company (and each of their respective heirs and legal and personal representatives), in each case who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (including any action by or in the right of the Company or any of the Members), by reason of any actions or omissions or alleged actions or omissions arising out of such Person's activities either on behalf of the Company or in furtherance of the interests of the Company, if such activities were performed in good faith either on behalf of the Company or in furtherance of the interests of the Company and in a manner reasonably believed by such Person to be within the scope of the authority conferred by this Agreement or by Applicable Law, against losses, damages and expenses (which shall in each case be advanced as and when incurred) for which such Person has not otherwise been reimbursed (including attorneys' fees, judgments, fines and amounts paid in settlement) actually and reasonably incurred by such Person in connection with such action, suit or proceeding, except for any liability that a court of competent jurisdiction shall have ultimately determined to have arisen from such Indemnified Party's fraud, willful misconduct, gross negligence or intentional breach of its obligations hereunder; provided, that any Person entitled to indemnification from the Company hereunder shall first seek recovery under any insurance policies by which such Person is covered and shall obtain the written Consent of the Managing Member prior to entering into any compromise or settlement that would result in an obligation of the Company to indemnify such Person.

(c)　　The Company shall have the power and authority to purchase and maintain insurance on behalf of any present or future Indemnified Party (each an "**Insured Party**") against any liability asserted against such Insured Party by reason of actions or omissions or alleged actions or omissions taken or omitted to be taken by the Insured Party in connection with the Company and its business and affairs (including insurance against liability for any breach or alleged breach of its fiduciary responsibilities), whether or not the Company would have the power to indemnify such Insured Party against such liability under this Section 5.06.

(d)　　Notwithstanding anything to the contrary contained herein, any indemnity to an Indemnified Party provided herein shall be junior to any indemnity provided by an Affiliate of the Company. Additionally, the Company shall have the right of subrogation with respect to the rights of an Indemnified Party against any subsidiary of the Company.

**ARTICLE VI**
**MEETINGS OF MEMBERS**

6.01　　<u>Meetings</u>. Meetings of the Members shall be held if, as and when called by the Managing Member, by the President, or by Members holding not less than a majority of the aggregate Percentage Interests for the purpose of transacting such business as may properly come before each such meeting.

6.02　　<u>Place of Meetings</u>. The Managing Member or the Person calling the meeting may designate any place as the place of meeting for any meeting of the Members. If no designation is made, or if a special meeting be otherwise called, the place of meeting shall be the principal executive office of the Company or as otherwise determined by the Managing Member.

6.03     Notice of Meetings. Except as provided in Section 6.04 below, notice of the date, time and place of each meeting shall be given to each Member no fewer than five (5) nor more than thirty (30) days before the date of the meeting.

6.04     Meeting of All Members. If all of the Members shall meet at any time and place, and Consent to the holding of a meeting at that time and place, the meeting shall be valid without call or notice, and at the meeting lawful action may be taken.

6.05     Record Date. For the purpose of determining Members entitled to notice of or to vote at any meeting of Members or any adjournment of the meeting, or Members entitled to receive payment of any distribution, or to make a determination of Members for any other purpose, the date on which notice of the meeting is mailed or the date on which the resolution declaring the distribution is adopted, as the case may be, shall be the record date for the determination of Members. When a determination of Members entitled to vote at any meeting of Members has been made as provided in this Section 6.05, the determination shall apply to any adjournment of the meeting.

6.06     Quorum. Members holding at least a majority of the issued and outstanding Units, represented in person or by proxy, shall constitute a quorum at any meeting of Members. In the absence of a quorum at any meeting of Members, a majority of the issued and outstanding Units so represented may adjourn the meeting from time to time for a period not to exceed sixty (60) days without further notice. However, if the adjournment is for more than sixty (60) days, or if after the adjournment a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each Member of record entitled to vote at the meeting. At an adjourned meeting at which a quorum shall be present or represented, any business may be transacted which might have been transacted at the meeting as originally noticed. The Members present at a duly organized meeting may continue to transact business until adjournment, notwithstanding the withdrawal during the meeting of Members holding Units the absence of which would cause there to be less than a quorum.

6.07     Voting Threshold; Manner of Acting. If a quorum is present in person or by proxy at the meeting, the approval or vote of at least a majority in interest of the Members shall constitute the Consent and be the act of the Members, unless the vote of a greater or lesser proportion or number is otherwise required by the Act or by this Agreement (unless the vote of a greater or lesser proportion or number is otherwise required by the Act or by this Agreement, in which case the approval or vote of at least such greater or lesser proportion or number shall constitute the Consent and be the act of the Members).

6.08     Proxies. At all meetings of Members, a Member may vote in person or by proxy executed in writing by the Member or by a duly authorized attorney-in-fact. The proxy shall be filed with the Managing Member before or at the time of the meeting. No proxy shall be valid after eleven (11) months from the date of its execution, unless otherwise provided in the proxy.

6.09     Action by Members Without a Meeting. Action required or permitted to be taken at a meeting of Members may be taken without a meeting if the action is evidenced by one or more written Consents describing the action taken, signed by Members having aggregate Percentage Interests sufficient to take such action at a duly called Meeting of such Members and delivered to the Company for inclusion in the minutes or for filing with the Company records.

6.10     Waiver of Notice. When any notice is required to be given to any Member, a waiver of the notice in writing signed by the Person entitled to the notice, whether before, at, or after the time stated therein, shall be equivalent to the giving of the notice.

**ARTICLE VII**
**BOOKS, RECORDS AND BANK ACCOUNTS**

7.01     Tax and Financial Matters. The Managing Member, or such other Person designated by the Managing Member, shall be responsible for preparing or causing to be prepared all tax and accounting records for the Company. The Managing Member may appoint Accountants to be engaged by the Company. The Managing Member shall designate a Member to be the "tax matters partner" of the Company, who shall initially be the Managing Member, until such time, if any, as a successor shall have been designated by the Managing Member. The cost of preparing the Company's tax return shall be paid by the Company as a Company expense.

7.02     Books and Records. The Managing Member, or its designee, shall keep true and complete books of account with respect to the operations of the Company. Such books shall be maintained at the principal place of business of the Company, or at such other place as the Managing Member shall determine.

7.03     Accounting Basis and Fiscal Year. The books of account of the Company shall be kept on the cash basis of accounting or on such other method of accounting as the Managing Member may from time to time determine. Subject to compliance with the applicable provisions of the Code and the Treasury Regulations, the fiscal year of the Company shall end on December 31 or such other date as the Managing Member may from time to time determine.

7.04     Bank Accounts. The Managing Member shall be responsible for causing one or more accounts to be maintained in one or more banks or other depository institutions, which accounts shall be used for the payment of the expenditures incurred by the Managing Member and any officers in connection with the business of the Company, and into which shall be deposited any and all cash receipts.

All such amounts shall be and remain the property of the Company, and shall be received, held and disbursed by the Managing Member, or such other Person determined by the Managing Member, for the purposes specified in this Agreement. There shall not be deposited in any of said accounts any funds other than funds belonging to the Company, and no other funds shall be commingled with such funds.

7.05     Section 83 Safe Harbor Election. With respect to any interest in the Company transferred in connection with the performance of services to the Company on or after the effective date of Proposed Treasury Regulations Section 1.83-3(l) and the proposed Revenue Procedure set forth in Internal Revenue Service Notice 2005-43 or successor provisions (collectively, the "**Safe Harbor Rules**"): (i) unless otherwise determined by the Managing Member, any recipient of such an interest, all of whose interest in the Company immediately after the transfer is substantially nonvested (within the meaning of Treasury Regulations Section 1.83-3(b)), shall make the election described in Code Section 83(b) with respect to such interest within thirty (30) days of such transfer; and (ii) the Company is authorized to elect to apply the Safe Harbor Rules, and the Company and each of the Members (including any Person to whom Units are transferred in connection with the performance of services) agree to comply with all requirements of the Safe Harbor Rules with respect to any interest in the Company transferred in connection with the performance of services while the election remains effective.

**ARTICLE VIII**
**RIGHT OF FIRST REFUSAL; TRANSFERABILITY OF UNITS; LIMITED REPURCHASE RIGHT**

8.01     Right of First Refusal.

(a)     Grant. Subject to the terms of Section 8.05 below, each Member hereby unconditionally and irrevocably grants to the other Members a Right of First Refusal to purchase all or any portion of the Units that such Member may propose to transfer in a Proposed Member Transfer, at the same price and on the same terms and conditions as those offered to the Prospective Transferee.  Notwithstanding anything

17

DocuSign Envelope ID: 864344BE-FF75-4C2A-9A72-7D65C3EA8A76

to the contrary in this Agreement, all consideration proposed to be paid in connection with any Proposed Member Transfer must be in cash.

(b) <u>Notice</u>. Each Member proposing to make a Proposed Member Transfer must deliver a Proposed Transfer Notice to the Company and each other Member not later than thirty (30) days prior to the consummation of such Proposed Member Transfer. Such Proposed Transfer Notice shall (i) certify that such Member has received a firm offer from the Prospective Transferee and in good faith believes a binding agreement for the Proposed Member Transfer is obtainable on the terms set forth in the Proposed Transfer Notice, and (ii) contain the material terms and conditions (including price and form of consideration) of the Proposed Member Transfer and the identity of the Prospective Transferee (and a description of such Member's relationship to or affiliation with the Prospective Transferee. To exercise its Right of First Refusal under this Article VIII, the Company will deliver an Exercise Notice to the selling Member within thirty (30) days after delivery of the Proposed Transfer Notice.

(c) <u>Closing</u>. The closing of the purchase of Units by the Purchasing Member shall take place, and all payments from the Purchasing Member shall have been delivered to the selling Member, thirty (30) days after delivery of the Proposed Transfer Notice.

(d) <u>Additional Compliance</u>. If any Proposed Member Transfer is not consummated within one hundred twenty (120) days after receipt of the Proposed Transfer Notice by the Purchasing Member, the Members proposing the Proposed Member Transfer may not sell any Units unless it first complies in full with each provision of this Section 8.01.

8.02    <u>Effect of Failure to Comply</u>.

(a) <u>Transfer Void; Equitable Relief</u>. Any Proposed Member Transfer not made in compliance with the requirements of this Agreement shall be null and void *ab initio*, shall not be recorded on the books of the Company or its transfer agent, and shall not be recognized by the Company. Each party hereto acknowledges and agrees that any breach of this Agreement would result in substantial harm to the other parties hereto for which monetary damages alone could not adequately compensate. Therefore, the parties hereto unconditionally and irrevocably agree that any non-breaching party hereto shall be entitled to seek protective orders, injunctive relief and other remedies available at law or in equity (including, without limitation, seeking specific performance or the rescission of purchases, sales and other transfers of Units not made in strict compliance with this Agreement).

(b) <u>Violation of Right of First Refusal</u>. If any Member (or his successors in interest) becomes obligated to sell any Units to a Purchasing Member under this Agreement and fails to deliver such Units in accordance with the terms of this Agreement, the Purchasing Member may, at its option, in addition to all other remedies it may have, send to such selling Member the purchase price for such Units as is herein specified and transfer to the name of the Purchasing Member (or request that the Company effect such transfer) on the Company's books the certificate or certificates representing the Units to be sold.

8.03    <u>Exempted Transfers</u>. Notwithstanding the foregoing or anything to the contrary herein, the provisions of Section 8.01 shall not apply: (a) to a transfer of Units by a Member made for bona fide estate planning purposes, either during his or her lifetime or on death by will or intestacy to his or her spouse, child (natural or adopted), or any other direct lineal descendant or ancestor of such Member (or his or her spouse) (all of the foregoing collectively referred to as "**family members**"), or any custodian or trustee of any trust, partnership or limited liability company solely for the benefit of, or the ownership interests of which are owned wholly by, such Member or any such family members; or (b) to sale or transfer to an existing Member; provided, that in the case of clause(s) (a) or (b), the Member shall deliver prior written notice to the Company of such pledge, gift or transfer and such Units shall at all times

remain subject to the terms and restrictions set forth in this Agreement and such transferee shall, as a condition to such issuance, deliver a counterpart signature page to this Agreement as confirmation that such transferee shall be bound by all the terms and conditions of this Agreement as a Member; and, provided, further, that in the case of any transfer pursuant to clause (a), that such transfer is made pursuant to a transaction in which there is no consideration actually paid for such transfer. The transferees described in this Section 8.03, are sometimes referred to herein as "**Permitted Transferees**."

8.04    General.  No Member may sell, offer to sell, transfer, assign, pledge, gift, devise, encumber or otherwise alienate or dispose of all or any part of its interest in the Company, whether voluntarily, involuntarily, by operation of law or otherwise (the doing of any of the foregoing, to "**Assign**" or to make an "**Assignment**"), voluntarily retire, or withdraw from the Company, except in accordance with the terms of this Agreement. Any purported Assignment in contravention of any of the terms of this Agreement shall be null and void *ab initio* and ineffective to transfer any interest in the Company, and shall not bind or be recognized by or on the books of the Company, and any transferee or assignee in any such transaction shall not be, be treated as or be deemed to be a Member for any purpose.

8.05    Admission of Members. A Person (including, without limitation, a Person who becomes a holder of Units as assignee of a Member in accordance with the terms of this Agreement or upon exercise of any warrant or option for the purchase of Units) is admitted as a member of the Company and becomes entitled to the rights of a holder of Units or other interests of the Company (including Profits Interests) upon compliance with all applicable terms of this Agreement and execution and delivery of an instrument agreeing to be bound by the terms and provisions of this Agreement, whereupon the Managing Member or its designee shall promptly amend Schedule A hereto to reflect such admission. Subject to the preceding sentence, in the case of Members admitted in connection with the performance of services to the Company, such admission may be upon such terms and conditions as the Managing Member shall approve, including without limitation issuing to such Members interests with limited or no voting rights or interests that are forfeitable or subject to repurchase based on a vesting schedule relating to continued provision of services, or that are Profits Interests.

8.06    Assignment. Except in connection with an exempt transfer pursuant to Section 8.03, no Member may Assign, directly or indirectly, all or any part of his or its Units without the Consent of the Managing Member, which Consent may be withheld for any reason. In addition, with respect to any Member that is an entity, any Assignment of any interest of the underlying equity securities of such Member shall be deemed to be an "Assignment" of such Member's Units for purposes of this Section 8.06, and shall require the Consent of the Managing Member. Any such Assignment shall be null and void *ab initio*.

8.07    Substitution. An assignee may become a Substitute Member only if:

(a)  the Managing Member approves such substitution;

(b)  in the case of Assignments other than by operation of law, the assignor states his intention in writing to have his assignee become a Substitute Member; and

(c)  such Person agrees, at the option of the Company, to pay any filing fees, reasonable counsel fees, and other reasonable expenses in connection with his becoming a Substitute Member hereunder.

8.08    Rights and Liabilities of an Assigning Member. Any Member who shall have Assigned all of his Units shall cease to be a Member of the Company, except for the purpose of determining the profits, losses and net cash proceeds allocable to his assignee, and shall no longer have any of the rights or privileges of a Member.

8.09   Termination. This Article VIII shall automatically terminate upon the earlier of (a) immediately prior to the consummation of an initial public offering of the Company's equity securities; and (b) the consummation of a Change of Control.

## ARTICLE IX
## CONFIDENTIALITY; NON-COMPETITION

9.01   Confidentiality. Each Member shall maintain the confidentiality of information that is, to the knowledge of such Member, non-public information regarding (i) the Company, or (ii) the business of the Company or its Affiliates, unless consented to in writing by the Managing Member, and except as may be required by Applicable Law. Notwithstanding anything to the contrary herein, a Member may disclose to any and all Persons any information that is or becomes generally available to the public other than as a result of the disclosure of such information by such Member (or its Affiliates) in breach of this Section 9.01.

## ARTICLE X
## DISSOLUTION AND TERMINATION

10.01   Events of Dissolution.

(a)   The Company shall be dissolved on a date and at a time designated by the written Consent of the Managing Member.

(b)   Dissolution of the Company shall be effective on the day on designated pursuant to Section 10.01(a), but the Company shall not terminate until the Certificate of Formation shall have been cancelled and the assets of the Company shall have been distributed as provided pursuant to this Agreement. Notwithstanding the dissolution of the Company, prior to the termination of the Company, as aforesaid, the business of the Company and the affairs of the Members and officers, as such, shall continue to be governed by this Agreement. Upon dissolution, the Managing Member or a liquidator appointed by the Managing Member, shall liquidate the assets of the Company and apply and distribute the proceeds thereof as contemplated by this Agreement and cause the cancellation of the Certificate of Formation.

10.02   Distributions Upon Liquidation.

(a)   After payment of liabilities owing to creditors, the Managing Member or a liquidator appointed by the Managing Member, shall set up such reserves as such Person deems reasonably necessary for any contingent or unforeseen liabilities or obligations of the Company. Said reserves may be paid over by the Managing Member or such liquidator to a bank, to be held in escrow for the purpose of paying any such contingent or unforeseen liabilities or obligations and, at the expiration of such period as the Managing Member or such liquidator may deem advisable, such reserves shall be distributed to the Members or their assigns in the manner set forth in Section 10.02(b) below.

(b)   After paying such liabilities and providing for such reserves, the Managing Member or such liquidator shall cause the remaining net assets of the Company to be distributed to and among the Members in accordance with their positive Capital Account balances. In the event that any part of such net assets consists of notes or accounts receivable or other non-cash assets, the Managing Member or such liquidator may take whatever steps he deems appropriate to convert such assets into any other form which would facilitate the distribution thereof. If any assets of the Company are to be distributed in kind, such assets shall be distributed on the basis of their fair market value as determined in the discretion of the Managing Member or such liquidator.

DocuSign Envelope ID: 864344BE-FF75-4C2A-9A72-7D65C3EA8A76

**ARTICLE XI**
**DISPUTE RESOLUTION**

11.01   <u>Governing Law</u>. This Agreement shall be governed by the internal law of the State of Delaware, without regard for its principles of conflicts of laws.

11.02   <u>Arbitration</u>. Any unresolved controversy or claim arising out of or relating to this Agreement, except as (i) otherwise provided in this Agreement, or (ii) any such controversies or claims arising out of either party's intellectual property rights for which a provisional remedy or equitable relief is sought, shall be submitted to arbitration by one arbitrator mutually agreed upon by the parties, and if no

agreement can be reached within thirty (30) days after names of potential arbitrators have been proposed by the American Arbitration Association (the "**AAA**"), then by one arbitrator having reasonable experience in limited liability company operating agreements of the type provided for in this Agreement and who is chosen by the AAA. The arbitration shall take place in Denver, Colorado, USA, in accordance with the AAA rules then in effect, and judgment upon any award rendered in such arbitration will be binding and may be entered in any court having jurisdiction thereof. There shall be limited discovery prior to the arbitration hearing as follows: (a) exchange of witness lists and copies of documentary evidence and documents relating to or arising out of the issues to be arbitrated, (b) depositions of all party witnesses and (c) such other depositions as may be allowed by the arbitrator upon a showing of good cause. Depositions shall be conducted in accordance with the Delaware Rules of Civil Procedure, the arbitrator shall be required to provide in writing to the parties the basis for the award or order of such arbitrator, and a court reporter shall record all hearings, with such record constituting the official transcript of such proceedings. The prevailing party shall be entitled to reasonable attorney's  fees, costs, and necessary disbursements in addition to any other relief to which such party may be entitled. Each of the parties to this Agreement consents to personal jurisdiction in the U.S. District Court for the District of Colorado or any court of the State of Colorado having subject matter jurisdiction for any matter for which arbitration pursuant to this subsection is not the exclusive remedy, or to enforce an arbitral award hereunder.

      11.03   <u>WAIVER OF JURY TRIAL</u>. EACH PARTY HEREBY WAIVES ITS RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT OR THE SUBJECT MATTER HEREOF. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING, WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS (INCLUDING NEGLIGENCE), BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. THIS SECTION HAS BEEN FULLY DISCUSSED BY EACH OF THE PARTIES HERETO AND THESE PROVISIONS WILL NOT BE SUBJECT TO ANY EXCEPTIONS. EACH PARTY HERETO HEREBY FURTHER WARRANTS AND REPRESENTS THAT SUCH PARTY HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL, AND THAT SUCH PARTY KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.

### ARTICLE XII
### MISCELLANEOUS

      12.01   <u>Notices</u>. All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively given upon the earlier of actual receipt or (a) personal delivery to the party to be notified, (b) when sent, if sent by electronic mail during normal business hours of the recipient, and if not sent during normal business hours, then on the recipient's next business day, (c) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) one (1) business day after deposit with a nationally recognized overnight courier, freight prepaid, specifying next business day delivery, with written verification of receipt. All communications shall be sent to the respective parties at their address as set forth in the first paragraph hereof, as the case may be, or to such email address, facsimile number or address as subsequently modified by written notice given in accordance with this paragraph. If notice is given to the Company, a copy (which shall not constitute notice) shall also be sent to the Company's counsel, Odell Girton Siegel LLC, Attn: Josh Kalish, notices@ogslawllc.com.

      12.02   <u>Successors and Assigns</u>. This Agreement, and each and every provision hereof, shall be

DocuSign Envelope ID: 864344BE-FF75-4C2A-9A72-7D65C3EA8A76

binding upon the parties hereto and their respective successors and assigns, and shall inure to the benefit of the parties and their respective successors and permitted assigns. The rights and obligations under this Agreement may not be Assigned by any party hereto unless and to the extent expressly permitted by the provisions of this Agreement.

12.03    Amendments. Any term and/or provisions of this Agreement may be amended, waived or terminated upon approval of the Managing Member, subject to the following: (i) all Members entitled to vote must give their written Consent to any amendment which would amend this Section 12.03; (ii) each Member entitled to vote to be affected must give its written Consent to any amendment that would cause such Member's share of the Company's assets, profits or losses to be modified, except to the extent such modification is in connection with the issuance of Additional Securities in accordance with Section 3.03 of this Agreement; and (iii) the Managing Member is authorized, without the Consent of any Member to make amendments to this Agreement: (A) to add to the duties or obligations (but not the powers or rights) of the Managing Member or surrender any right or power granted to the Managing Member herein for the benefit of the Members; (B) to preserve the status of the Company as a "partnership" for federal income tax purposes; and (C) to amend Schedule A hereto to reflect the issuance of Additional Securities in accordance with Section 3.03 of this Agreement and, if applicable, the admission or withdrawal of Members as authorized by this Agreement; provided, that prompt notice of each such amendment shall be delivered to each Member.

12.04    Partition. The Members hereby agree that no Member nor any successor-in-interest to any Member shall have the right while this Agreement remains in effect to have any property of the Company partitioned, or to file a complaint or institute any proceeding at law or in equity to have any property of the Company partitioned, and each Member, on behalf of himself or itself, his or its successors, representatives, heirs, and assigns, hereby waives any such right. It is the intention of the Members that, during the term of this Agreement, the rights of the Members and their successors-in-interest, as among themselves, shall be governed by the terms of this Agreement, and that the right of any Member or successor-in-interest to Assign its interest in the Company's properties shall be subject to the limitations and restrictions of this Agreement.

12.05    Waivers and Consents; No Waiver of Rights, Powers and Remedies. No waiver or Consent shall be deemed to be or shall constitute a waiver or Consent with respect to any other terms or provisions of this Agreement, whether or not similar. Each such waiver or Consent shall be effective only in the specific instance and for the purpose for which it was given, and shall not constitute a continuing waiver or Consent. No failure or delay by a party hereto in exercising any right, power or remedy under this Agreement, and no course of dealing among the parties hereto, shall operate as a waiver of any such right, power or remedy of the party.  No single or partial exercise of any right, power or remedy under this Agreement by a party hereto, nor any abandonment or discontinuance of steps to enforce any such right, power or remedy, shall preclude such party from any other or further exercise thereof or the exercise of any other right, power or remedy hereunder. The election of any remedy by a party hereto shall not constitute a waiver of the right of such party to pursue other available remedies. No notice to or demand on a party not expressly required under this Agreement shall entitle the party receiving such notice or demand to any other or further notice or demand in similar or other circumstances or constitute a waiver of the rights of the party giving such notice or demand to any other or further action in any circumstances without such notice or demand.

12.06    Schedules and Exhibits. All Exhibits and Schedules attached hereto are an integral part of this Agreement and are incorporated herein by this reference.

12.07    Entire Agreement. This Agreement embodies the entire agreement and understanding between the parties hereto with respect to the subject matter hereof, and supersedes all prior oral or written agreements and understandings relating to the subject matter hereof, including without limitation, the Interim Operating Agreement.

12.08    Headings. Headings or captions of the various subdivisions of this Agreement are inserted only as a matter of convenience and for reference, and in no way define, limit, extend or describe the scope of this Agreement or the intent of any provision hereof.

12.09    Counterparts. This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Counterparts may be delivered via facsimile, electronic mail (including pdf or any electronic signature complying with the U.S. federal ESIGN Act of 2000, *e.g.*, www.docusign.com) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

12.10    Equitable Remedies. Each of the parties hereto acknowledges and agrees that the rights acquired by each party hereunder are unique and that irreparable damages would occur in the event that any of the provisions of this Agreement to be performed by the other parties were not performed in accordance with their specific terms or were otherwise breached. Accordingly, in addition to any other remedy to which the parties hereto are entitled at law or in equity, each party hereto shall be entitled to an injunction or injunctions to prevent breaches of this Agreement by any other party and to enforce specifically the terms and provisions hereof in any federal or state court to which the parties have agreed hereunder to submit to jurisdiction.

12.11    Creditors. None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditor of any Member or of the Company.

12.12    Severability. In the event that any court of competent jurisdiction shall determine that any provision, or any portion thereof, contained in this Agreement shall be unenforceable in any respect, then such provision shall be deemed limited to the extent that such court deems it enforceable, and as so limited shall remain in full force and effect. In the event that such court shall deem any such provision, or portion thereof, wholly unenforceable, the remaining provisions of this Agreement shall nevertheless remain in full force and effect.

12.13    Interpretation. The parties hereto acknowledge and agree that: (i) each party has had an adequate opportunity to review, and to have such party's counsel review, and negotiate the terms and provisions of this Agreement and has contributed to its finalization; (ii) the rule of construction to the effect that any ambiguities are resolved against the drafting party shall not be employed in the interpretation of this Agreement; and (iii) the terms and provisions of this Agreement shall be construed fairly as to all parties hereto and not in favor of or against any party, regardless of which party was generally responsible for the preparation of this Agreement.

[signature page follows]

IN WITNESS WHEREOF, the parties have caused this Limited Liability Company Operating Agreement to be executed as of the day and year first above written.

**CRYPTOWATT INVESTMENT PARTNERS, LLC**

Name: Matthew B. Goettsche

Title:  Chief Executive Officer

**MEMBERS:**

**HARD FORK HOLDINGS, INC.**

Name: Matthew B. Goettsche

Title:  Chief Executive Officer

**CRYPTOWATT MANAGEMENT, LLC**

Name: Daniel Burrell

Title:  CEO

Name: Kevin Washington

Title:  Member

**JOBADIAH WEEKS**, individually

**SCHEDULE A**

*Updated by the Managing Member as of August 24, 2019 in accordance with Section 12.03 of the Agreement*

| Member Name | Capital Contributions | Units[3] | Percentage Interest[4] |
|---|---|---|---|
| Hard Fork Holdings, Inc. | $104,158,644.65[1] | 7,830,856 Units | 72.9% |
| CryptoWatt Management LLC[2] | $38,668,180.80 | 2,910,000 Units | 27.1% |

[1] Capital Contributions of the Managing Member (Hard Fork Holdings, Inc.) include (i) an original capital contribution by the Managing Member of $101,953,644.65 as set forth in Schedule A of the Company's Limited Liability Company Operating Agreement dated as of October 1, 2018 (the "Original Agreement") and (ii) the contribution by the Managing Member of 900 B8 miners at a total contribution value of $2,205,000, as set forth in more detail in the written notice from the Managing Member to Kevin Washington (sole member of CW Management) dated as of August 18, 2019 (the "B8 Contribution").

[2] Prior to December 7, 2018, 50% of the membership interests of CW Management were owned by Burrell Diversified Investments, LLC ("BDI") and the remaining 50% of the membership interests of CW Management were owned by Kevin Washington, an individual ("KW").  As of December 7, 2018, BDI transferred 100% of its ownership interest in CW Management to KW pursuant to a Membership Interest Power dated as of that date. As a result, as of this updated Schedule A, KW owns 100% of CW Management.

[3] Schedule A of the Original Agreement listed "Jobadiah Weeks" as a Member of the Company and an owner of 300,000 Units, / 3% Percentage Interest of the Company "subject to the terms and conditions (including, without limitation, the vesting schedule) set forth in the Profits Interest Grant Agreement between the Company and Mr. Weeks dated as of [October 1, 2018]".  As of July 29, 2019, the Company and Mr. Weeks entered into that certain Acknowledgement and Release Agreement pursuant to which, among other things, Mr. Weeks acknowledged and agreed that (i) the Profits Interest Grant Agreement between the Company and Mr. Weeks was never executed and delivered by the Company, (ii) none of the 300,000 Units or 3% Percentage Interest described in the Original Agreement had vested, (iii) Mr. Weeks was not a Member of the Company and did not have any claim to distributions of any kind from the Company and (iv) that Company was released of any claims whatsoever relating to the Profits Interest Grant Agreement and any services performed by Mr. Weeks on behalf of the Company.

[4] As updated, this Schedule A accounts for a previous transfer by the Managing Member to CW Management of 4% of the Company in accordance with the terms of that certain Memorandum of Understanding, dated as of December 7, 2018, by and among Matthew B. Goettsche, Daniel Burrell and Kevin Washington, each individually and on behalf of the entities that they control. Therefore, as a result of the B8 Contribution (defined above), CW Management's Percentage Interest was reduced from 30% to 27.1%.