1   Gretchen M. Nelson (State Bar No. 112566)
    gnelson@nflawfirm.com
2   Gabriel S. Barenfeld (State Bar No. 224146)
    gbarenfeld@nflawfirm.com
3   NELSON & FRAENKEL LLP
    601 So. Figueroa Street, Suite 2050
4   Los Angeles, CA 90017
    Telephone: 213-622-6469
5   Telecopier: 213-622-6019

6

7   Jules G. Radcliff Jr. (State Bar No. 72316)
    jradcliff@radcliffmayes.com
8   RADCLIFF MAYES LLP
    515 S. Flower St., 18th Floor
9   Los Angeles, California  90071
    Telephone: 213-788-5336
10

11  *Attorneys for Plaintiff*

12              SUPERIOR COURT FOR THE STATE OF CALIFORNIA
                    FOR THE COUNTY OF LOS ANGELES
13

14  EVAN BIRENBAUM, an individual,          CASE NO. 19STCV39029

                    Plaintiff,              (Hon. Steven J. Kleifield, Dept. 57)
15          v .

16  CRYPTOWATT MINING LLC, a               **FIRST AMENDED COMPLAINT FOR
    Delaware limited liability company;    DAMAGES FOR**
17  BITPOWER, LLC, a Delaware limited
    liability company; BITPOWER
18  MANAGEMENT, LLC, a Delaware               1.  Breach of Contract;
    limited liability company; BITPOWER      2.  Breach of The Implied Covenant of
19  INVESTMENT PARTNERS, LLC, a                   Good Faith and Fair Dealing;
    Delaware limited liability company;      3.  Fraud;
20  BURRELL DIVERSIFIED                       4.  Negligent Misrepresentation
    INVESTMENTS LLC, a Delaware limited      5.  Recovery of Unpaid Wages, Labor
21  liability company; TANGO & CASH, LLC,        Code § 201 Violation;
    a Delaware limited liability company;    6.  Intentional Interference with Contract;
22  CRYPTOWATT MANAGEMENT, LLC, a            7.  Intentional Interference with
    Delaware limited liability company;          Prospective Economic Advantage.
23  TOKENBLOCK, INC., a Delaware
    corporation; DANIEL BURRELL, an
24  individual; KEVIN WASHINGTON, an        **DEMAND FOR JURY TRIAL**
    individual; FRED VON GRAF, an
25  individual; and DOES 1 through 100,

26                  Defendants.

27

28                                          **Exhibit B**

**FIRST AMENDED COMPLAINT FOR DAMAGES**

Plaintiff EVAN BIRENBAUM brings this action against Defendants CRYPTOWATT MINING, LLC, a Delaware limited liability company; BITPOWER, LLC, a Delaware limited liability company; BITPOWER MANAGEMENT, LLC, a Delaware limited liability company; BITPOWER INVESTMENT PARTNERS, LLC, a Delaware limited liability company; BURRELL DIVERSIFIED INVESTMENTS, LLC, a Delaware limited liability company; TANGO & CASH LLC, a Delaware limited liability company; CRYPTOWATT MANAGEMENT, LLC, a Delaware limited liability company; TOKENBLOCK, INC., a Delaware Corporation; DANIEL BURRELL, an individual; KEVIN WASHINGTON, an individual; FRED VON GRAF, an individual; and DOES 1 through 100, and alleges as follows.

**INTRODUCTION**

1.    In or around 2017, Defendants, Daniel Burrell ("Burrell") and Kevin Washington ("Washington") began to explore plans to build a facility to mine bitcoins. Bitcoin, often described as a cryptocurrency, is a digital currency that is completely virtual.  Each bitcoin is basically a digital asset stored in a "digital wallet."  People can send bitcoins (or part of one) to a digital wallet, where the receipt and transaction is verified by bitcoin miners and datacenters, like the facility at issue in this case. The transaction is then recorded to a public ledger called a blockchain. The miners, that verify transactions to the blockchain, are then rewarded with bitcoin (or transaction fees) for providing such a service. Every transaction is recorded in a public list that makes it possible to trace the history, if the wallet addresses are known, of bitcoins to prevent the illegal transfer of coins from someone who does not own the coin or to prevent duplicate transfers or undoing transactions.  Bitcoin networks (or nodes) are designed to verify transactions, to the blockchain ledger, through solving complicated equations and algorythms, which can be done at scale in large datacenters.

2.    Bitcoin is a completely decentralized digital currency.  The bitcoin economy has grown since it was first developed in 2009 into an economy that is larger than that of some of the world's smaller nations.  The value of a bitcoin has grown and fluctuated from pennies in its early days to more than $19,000 in 2017.  And to date in 2020, bitcoin value has ranged from a low of just under $5,000 to a high of over $10,000.

3.      Bitcoin mining is the backbone of the bitcoin network.  Miners essentially issue new bitcoins, confirm transactions and secure the network.  This is done using specialized computers that process every bitcoin transaction by solving a computational mathematical problem that allows them to chain together blocks of transactions (hence the term "blockchain," which is applied to the bitcoin currency).  Miners are finally rewarded with newly-created bitcoins and transaction fees.

4.      Although technically anyone can become a bitcoin miner, mining has become increasingly specialized and is now largely done professionally by companies that are able to build large data centers supplied by relatively inexpensive electricity in a cool climate.  The companies either purchase or host specialized computer hardware that runs 24/7 creating bitcoins.

5.      As the value of bitcoins began to sore, defendants Burrell and Washington initially began to procure bitcoin mining equipment from an individual who was heavily involved in bitcoin, Joby Weeks ("Weeks"). Burrell and Washington had limited, if any, knowledge on the building or running of a mining company, including how to setup the equipment, what equipment and infrastructure was needed, or the manner in which miners operate.  As a result, when Burrell and Washington started buying equipment from Weeks, Weeks flew Plaintiff and others to New Mexico, to meet with Burrell, to discuss logistics relating to the purchase of mining equipment and to provide details on how to set up a mining company, including technical, logistical and operational electrical requirements.  Plaintiff provided critical input and information on these details.  From that discussion,  the specifics of a plan were formed to build a data center. Burrell along with David Bennett, who was a financial analyst for BDI, began modeling out financial projections to procure mining equipment and operate the equipment. During the meeting, Plaintiff provided the necessary insight into the preferred operation conditions for a data center and explained that New Mexico, Burrell's preferred location, was not ideal.  Washington had ties with Montana and as a result, it was decided to look to locate the facility in Montana where electricity is relatively cheap and the ambient temperature averages 45°.

6.      However, defendants lacked the necessary technical or engineering skills to implement their plan. Plaintiff on the other hand was highly knowledgeable as to technical aspects

of designing and operating the facility.  Defendants reached out to Plaintiff and lured him into working for them to, among other things, (i) lead and support efforts to secure locations for the mining facility or facilities; (ii) locate and negotiate or provide integral support for negotiations regarding a contract for an appropriate facility to house the bitcoin mining computer hardware; (iii) lead and support discussions with an electrical company to supply power to the facility; (iv) hold disussions with energy retailers to schedule power purchases in the energy market; (v) work with general contractors to build critical infrastructure to supply power to the facility; (vi) lead and support efforts to architect and build out the facilities; (vii) provide technical leadership and design of the overall datacenter and hire staff or resources for ongoing operations; and (viii) design and install the hardware in such a manner to maximize space and available electricity and operate efficiently so as to successfully mine bitcoin.

7.     In order to set their plan in motion, Defendants Daniel Burrell ("Burrell"), Kevin Washington ("Washington") and Burrell Diversified Investments, LLC ("BDI") formed a Delaware limited liability company that they called BitPower, LLC to own and operate the bitcoin plant. Upon information and belief, Defendants at some point also formed another Delaware limited liability company entitled BitPower Management, LLC to be the manager and parent company of BitPower, LLC.  A few short months after forming the foregoing limited liability companies, Burrell and Washington renamed BitPower, LLC, CryptoWatt Mining, LLC.  And they renamed BitPower Management, LLC to CryptoWatt Management, LLC.  Upon information and belief, in all respects the companies, no matter the name, operated in the same manner, held title to the same property and were owned by the same individuals or entities.  Unless otherwise stated, Defendants Burrell, Washington, Tango & Cash, LLC, BitPower, LLC, BitPower Management, LLC, CryptoWatt Mining, LLC and CryptoWatt Management, LLC are referred to herein collectively and separately as the "CryptoWatt Defendants."

8.     Throughout the time that the CryptoWatt Defendants were negotiating with Plaintiff, they knew full well that the only way to convince Plaintiff to work for them was to offer him a highly lucrative contract that would afford him a monthly salary, an ownership interest in the operation, revenues generated from the mining equipment, and a significant percentage of the

1    ultimate profits that would be earned from the bitcoin mining facility.  Moreover, the CryptoWatt

2    Defendants further knew that Plaintiff was the key to their ability to design and develop a

3    successful mining operation and without Plaintiff, they would not be able to accomplish their goal.

4         9.      In or around early November 2017, the CryptoWatt Defendants convinced Plaintiff

5    to commence work on the project with the promise of a contract that would afford Plaintiff a base

6    salary and shares in the operating entity as well as a percentage of the revenue to be earned from

7    the mining equipment.  Based on verbal and written representations made to him by the

8    CryptoWatt Defendants that Plaintiff would have a written contract containing the foregoing

9    terms, Plaintiff commenced work on the project in or around November 2017.  Ultimately, the

10   CryptoWatt Defendants presented Plaintiff with a contract nearly two months later, which

11   modified the original agreement to incorporate provisions that were less lucrative but provided for

12   a base salary, a signing bonus (but defendants modified the terms of the bonus to alter the

13   condition of payment) and "Membership Unit Awards" comprised of options and a percentage of

14   the investments and distributions of revenue paid to the Cryptowatt Defendants.  Plaintiff was told

15   that the agreement was "good and fair" but it was also "take it or leave it."  Since by that time

16   Plaintiff had spent hundreds of hours working on the project, had provided the CryptoWatt

17   Defendants with vital intellectual property information, and had not been paid any money he was

18   left with no alternative but to sign the agreement to recover the money he was owed and the

19   potential earnings he was told he would receive.

20        10.     Plaintiff worked countless hours developing, engineering and creating the bitcoin

21   plant and by February 2018, he had succeeded in getting a portion of the plant to a position of

22   being operational.  There were many technical challenges because among other things, the power

23   company was delaying approvals for major upgrades to the site, and equipment from vendors had

24   to be delivered. Moreover, Burrell modified the schedule and pushed to have as least 3 megawatts

25   powered up by specific dates threatening Plaintiff,  and the contractors and others if they did not

26   meet his demands. Plaintiff and others worked night and day and Plaintiff was able, with

27   assistance, to engineer a temporary solution to meet Burrell's demand to have the site up and

28   running by the end of February, even though Plaintiff informed Burrell that it would cause issues

1   with the downstream schedule.

2        11.    Future investors toured the facility as a part of Burrell's effort to get the company

3   to liquidity as fast as possible. During this period, Plaintiff was working with Washington and

4   David Bennett of BDI on financial projections, and was part of the group leading discussions with

5   investors. Investors who visited the site mentioned they had never seen such an amazing

6   achievement, and provided a rough estimated value of the site of $450 million.

7        12.    On or about February 23, 2017, the CryptoWatt Defendants suddenly and without

8   warning forced Plaintiff off the bitcoin plant. Plaintiff continued to work, from Los Angeles, on

9   the bitcoin plant's website and on branding and business development. About a month later, on

10  April 3, 2018, Plaintiffs' contract was terminated.  Since then, the CryptoWatt Defendants have

11  refused and continue to refuse to pay or provide Plaintiff with the bonus or any of the revenue or

12  shares and equity to which he was entitled.

13       13.    On information and belief, at all material times, the CryptoWatt Defendants,

14  including Defendants Burrell and Washington, never intended to provide Plaintiff with the

15  revenue, shares, or bonus but always intended to lure Plaintiff into providing the technical services

16  necessary to get the bitcoin plant up and running and then terminate Plaintiff from employment so

17  that the CryptoWatt Defendants could reap all of the rewards from the bitcoin mining operation

18  and avoid paying Plaintiff the substantial compensation he was owed.

19       14.    Moreover, after he was terminated, Plaintiff discovered that TokenBlock, Inc., and

20  one of its principals Fred Von Graf replaced Plaintiff with a TokenBlock project manager.  The

21  only way that the CryptoWatt Defendants could terminate Plaintiff in order to avoid paying him in

22  accordance with the contract was to enter into a deal to use the services of TokenBlock.  Von Graf

23  knew full well of the agreement between CryptoWatt and Plaintiff and, on information and belief,

24  intentionally acted to interfere with that contract so as to reap the benefits of a deal between

25  TokenBlock and the CryptoWatt Defendants.

26       **VENUE AND JURISDICTION**

27       15.    Venue is proper in this Court because at least one of the Defendants resides and

28  conducts business in this County and receives substantial compensation from the bitcoin plant at

1  the heart of this lawsuit in this County. Further, the CryptoWatt Defendants reached out to

2  Plaintiff and entered into a contract with Plaintiff in this County and many of the acts complained

3  of occurred in this County and gave rise to the claims alleged herein.

4       16.     Additionally, jurisdiction in this court is appropriate since at least one of the

5  defendants resides in this county and is a citizen of the state of California, and the remaining

6  Defendants engaged in business, entered into contractsor committed or targeted the acts

7  complained of here within this state and county.

8  **PARTIES**

9      **A.**     **Plaintiff**

10       17.     Plaintiff, Evan Birenbaum ("Birenbaum"), is, and at all times mentioned herein,

11  was a resident of Los Angeles County, California.

12      **B.**     **Defendants**

13       18.     Defendant Cryptowatt Mining, LLC ("CryptoWatt Mining"), is and at all material

14  times was a limited liability company formed under the laws of the state of Delaware with its

15  principal place of business located in Montana.  In January 2018, BitPower, LLC was renamed

16  CryptoWatt Mining.  On information and belief, the members of CryptoWatt Mining are

17  Defendants Burrell, Washington and BDI.

18       19.     Defendant Bitpower, LLC ("BitPower") is and at all material times was a limited

19  liability company formed under the laws of the state of Delaware with its principal place of

20  business located in Montana.  BitPower was purportedly formed in December 2017.  On

21  information and belief, the members of BitPower are Defendants Burrell, Washington and BDI.

22  In January 2018, BitPower was renamed CryptoWatt Mining.

23       20.     Defendant Bitpower Management, LLC ("BitPower Management") is and at all

24  material times was a limited liability company formed under the laws of the state of Delaware with

25  its principal place of business located in Montana.  BitPower Management was purportedly

26  formed in or around December 2017.  On information and belief, the members of BitPower

27  Management are Burrell and Washington.  In January 2018, BitPower Management was renamed

28  CryptoWatt Management, LLC.

21.     Defendant Bitpower Investment Partners, LLC, ("BitPower Investment") a Delaware limited liability company is an at all material times was a limited liability company formed under the laws of the state of Delaware with its principal place of business located in Montana.

22.     Defendant Burrell Diversified Investments, LLC ("BDI") is and at all material times was a Delaware limited liability company with its principal place of business located in either New Mexico or Colorado.  On information and belief, Burrell is a member of BDI.  BDI and Burrell and Washington formed CryptoWatt Mining and controlled and directed the operations of CryptoWatt Mining.

23.     Defendant Tango & Cash, LLC ("T&C"), is and at all material times was a Delaware limited liability company with its principal place of business located in either Colorado or California.  On information and belief, the members of T&C are Burrell and Washington.  On information and belief, T&C was an entity that Burrell and Washington used to transfer funds from the bitcoin mining business and funds owed to Plaintiff.

24.     Defendant Cryptowatt Management, LLC ("CryptoWatt Management"), is and at all material times was a Delaware limited liability company with its principal place of business located in Montana. CryptoWatt Management is the parent of CryptoWatt Mining and BitPower. In or around January 2018, BitPower Management was renamed CryptoWatt Management.  On information and belief, BDI and Defendants Daniel Burrell, Kevin Washington are the members of CryptoWatt Management.

25.     Defendant Tokenblock, Inc. ("Tokenblock"), is and at all material times was a Delaware Corporation with its principal place of business in Arizona.  Tokenblock was formed in or around 2016 by Plaintiff and Defendant Fred Von Graf and Anthony Kosednar.  In or around January 2018, Tokenblock began to assist the CryptoWatt Defendants by providing service and technology consulting.  The initial ownership of Tokenblock was that Plaintiff owned 40% of the shares, Von Graf owned 40% of the shares and Kosednar owned 20%.  In or around March 2018, Von Graf forced Plaintiff out of Tokenblock.

26.     Defendant Daniel Burrell, an individual, is a resident and citizen of the State of Utah.

27.     Defendant Kevin Washington, an individual, is a California resident and citizen and resides in the County of Los Angeles.

28.     Defendant Fred Von Graf, an individual, is a resident and citizen of Arizona.

29.     Plaintiff is unaware of the true names and capacities of the remaining defendants sued in this action by the fictitious names DOES 1 through 100. Plaintiff will amend his complaint when those names and/or capacities become known to Plaintiff. Plaintiff is informed and believes that each of the fictitiously named defendants is in some manner responsible for the events and allegations set forth in this complaint.

30.     Defendants, and each of them, and DOES 1-100, were the agents, servants, employees, independent contractors, co-conspirators, management companies, subsidiaries, and/or joint venturers, of the remaining defendants, and each of them, and were at all times material hereto, acting within the authorized course, scope, and purpose of said agency, employment or relationship, and/or that all said acts were subsequently performed with knowledge, acquiescence, ratification and consent of the respective principals, and the benefits thereof accepted by said principals.

31.     On information and belief, BitPower, BitPower Management, BitPower Investment, T&C, CryptoWatt Mining and CryptoWatt Management are not properly organized limited liability corporations and are merely instrumentalities of Burrell, Washington and BDI. Each of the foregoing limited liability companies were undercapitalized for purposes of corporate undertakings and these entities observed little or no corporate formalities.  BitPower, BitPower Management, BitPower Investment, T&C, CryptoWatt Mining and CryptoWatt Management were formed solely for the benefit of the dominant members of the companies.  Upon information and belief, BitPower, BitPower Management, BitPower Investment, T&C, CryptoWatt Mining and CryptoWatt Management have little or no corporate records and their existence is a mere façade for the individual dealings of its dominant members.  As a result, of the failure to maintain corporate formalities and for the reasons stated herein, the owners of BitPower, BitPower

Management, BitPower Investment, T&C, CryptoWatt Mining and CryptoWatt Management must be held liable for the actions of these entities.

**FACTS**

**A.     The Bitcoin Industry**

32.     Bitcoin, often described as a cryptocurrency, is a digital currency that is completely virtual.  Each bitcoin is basically a digital asset stored in a "digital wallet."  People can send bitcoins (or part of one) to a digital wallet, where the receipt and transaction is verified by bitcoin miners and datacenters, like the facility described in this case. The transaction is then recorded to a public ledger called a blockchain. The miners are rewarded with bitcoin (or transaction fees) for providing their services. Bitcoin networks (or nodes) are designed to verify transactions, to the blockchain ledger, through solving complicated equations and algorithms, which can be done at scale in large datacenters.

33.     Bitcoin is a completely decentralized digital currency.  The bitcoin economy has grown since it was first developed in 2009 into an economy that is larger than the economies of some of the world's smaller nations.  The value of a bitcoin has grown and fluctuated greatly from pennies in its early days to more than $19,000 in 2017.  And to date in 2020, bitcoin value has ranged from a low of just under $5,000 to a high of over $10,000.

34.     Traditional currencies are issued by central banks. The central bank can issue new units of money based on a variety of issues.  Bitcoin differs from a central bank in that the issuance rate is set in the computer code thus preventing cheating of the system or the creation of bitcoins out of thin air.

35.     Bitcoin are entirely digital tokens that do not require excavation or panning streams to extract gold or some other element or mineral.  But, bitcoin does involve a form of prospecting and recovery and thus the nomenclature "mining" is used to explain the process.  Bitcoin miners download and run mining software and often join a pool of other miners doing the same thing. Together or alone, the software compiles recent bitcoin transactions into blocks and proves their validity by calculating a "proof of work," that covers all of the data in the blocks. That involves

the mining hardware taking a huge number of guesses at a particular integer over and over until they find the correct one.

36.     Bitcoin mining is a computationally intense process that is further hampered by deliberate increases in difficulty as more and more miners attempt to create the next block in the chain. This is one of the reasons that people join pools and why only the most powerful of application specific integrated circuit (ASIC) mining hardware is effective at mining bitcoins today.

37.     The individual miner or pool that is the first to create the proof of work for a block is rewarded with transaction fees for those confirmed transactions and a subsidy of bitcoins that are generated through the process of mining. This will continue to happen until all 21 million bitcoins have been mined. With bitcoin, miners are rewarded about every 10 minutes.

38.     There is no guarantee that any one miner or mining pool will generate the correct integer needed to confirm a block and thereby earn the reward. Finding a block most closely resembles a type of network lottery. For each attempt to try and find a new block, which is basically a random guess for a lucky number, a miner has to spend a tiny amount of energy. Most of the attempts fail and a miner will have wasted that energy. Only once, generally about every ten minutes, will a miner succeed and thus add a new block to the blockchain.

39.     This also means that any time a miner finds a valid block, it must have statistically consumed much more energy for all the failed attempts. This "proof of work" is at the heart of bitcoins success.  Proof of work prevents miners from creating bitcoins out of thin air: they must consume real energy to earn them. And proof of work ossifies Bitcoin's history. If an attacker were to try and change a transaction that happened in the past, that attacker would have to redo all of the work that has been done since to catch up and establish the longest chain. This is practically impossible and is why miners are said to "secure" the bitcoin network.

40.     In exchange for securing the network, and as the "lottery price" that serves as an incentive for burning this energy, each new block includes a special transaction. It is this transaction that awards the miner with new bitcoins, which is how bitcoins first come into circulation. At bitcoins launch, each new block awarded the miner with 50 bitcoins, and this

amount halves every four years: Currently each block includes 12.5 new bitcoins. Additionally, miners retain any mining fees that were attached to the transactions included in their blocks.

41.     Bitcoin mining is thus the backbone of the bitcoin network.  Miners essentially issue new bitcoins, confirm transactions and secure the network.  This is done using specialized computers that process every bitcoin transaction by solving a computational mathematical problem that allows them to chain together blocks of transactions.

42.     Although technically anyone can become a Bitcoin miner, over the years, mining became increasingly specialized and is now largely done professionally by companies that are able to build large data centers supplied by relatively inexpensive electricity in a cool climate.  These corporate miners purchase a large number of specialized computer hardware that runs 24/7 mining code to create Bitcoins.

**B.     Defendants' Scheme to Build a Bitcoin Plant**

43.     In or around 2017, defendants Burrell and Washington first began procuring bitcoin mining equipment.  They met with a gentleman named Joby Weeks, a strong proponent of Bitcoin, with connections to, among other things, a mining pool network called BitClub Network.  Weeks provided Burrell and Washington with information on how the defendants could enter the Bitcoin mining industry and after first agreeing to purchase equipment from Weeks and others, defendants Burrell and Washington came upon the idea of building a plant to host bitcoin mining equipment but lacked the technical skills or ability to do so.  It was only as a result of discussions with Plaintiff that they realized that utilizing Plaintiff's services they could build and host a plant.  The concept was to build or find a facility in Montana to host the computer hardware necessary to mine Bitcoin with the intent to lease the facility to miners in exchange for a fee.  Weeks was originally to be a partner of Burrell and Washington in the bitcoin plant.

44.     Burrell and Washington began to alter their plan as they continued to meet and discuss issues with Weeks.  Ultimately, they decided to develop a facility that would host mining equipment and they decided that they too would purchase mining equipment so that they could themselves mine Bitcoin and benefit from the then-very high price of the currency.

1        45.    Burrell and Washington purchased bitcoin mining machines from BitFury and

2    BitMain.

3        46.    Integral to their plan was the need to locate someone who was capable of

4    engineering and building the necessary mainframe to house the equipment, redesigning, if

5    necessary, the facility, as well as someone with knowledge of the electrical requirements so as to

6    insure adequate wattage to run the mining equipment.  In addition, Burrell and Washington needed

7    someone with the knowledge of electrical suppliers so as to negotiate the necessary agreements for

8    electrical service.  Burrell and Washington were themselves neophytes in such areas and lacked

9    the necessary expertise to get the plan off the ground.

10       47.    In or around October 2017, Weeks introduced Burrell to Plaintiff.  Certified as a

11   Microsoft Systems Engineer, Plaintiff has a wealth of experience in developing cross-

12   infrastructure technology for big data applications. In 2014, Plaintiff co-founded the energy startup

13   Chai Energy, which provides data analytics and big data application, in the real-time energy

14   market and to utility customers.  He is a much sought-after provider in the U.S. market for the

15   design and development of technology tools and programs to power e-commerce, and has been at

16   the forefront of the development and market application of behavioral energy efficiency

17   technology.  At the time that he was introduced to Burrell and Washington, Plaintiff had recently

18   left employment as the program manager for Environmental Strategy and Sustainability at

19   Southern California Edison (SCE), where he was responsible for the development and

20   implementation of SCE's corporate responsibility and sustainability program. At SCE, Plaintiff

21   had worked with company executives, business managers, regulators, NGO's, and internal and

22   external stakeholders on a variety of issues relating to energy and water availability.  Plaintiff has

23   an extensive background in technology and has all of the necessary skills to design and implement

24   the bitcoin plant. In addition, Plaintiff has the necessary experience dealing with electrical

25   suppliers to negotiate agreements that would provide sufficient energy at a sustainable price.

26       48.    Initially, Plaintiff was courted by Weeks and Burrell to join the project.  However,

27   in early-December 2017, Burrell instructed Plaintiff to tell Weeks that Weeks was out of the

28   project while they were all meeting at Washington's home in Los Angeles.  Plaintiff was only

1    interested in participating if he received sufficient compensation that would include an interest in

2    the assets and revenue of the mining.  Burrell and Washington assured Plaintiff that he would be

3    compensated not only with a salary but that he would also receive a signing bonus and an interest

4    in the company to be formed to own the assets including the mining equipment, and the ultimate

5    profit earned by the company.

6        49.    Among other things, during this period, the CryptoWatt Defendants were

7    forecasting revenue for 2018 at approximately $112 million, 2019 at $712 million and gross

8    profits for 2018 at $98 million and $645 million in 2019.

9        50.    Plaintiff commenced work shortly after the first meeting, which occurred on

10   October 30, 2017.  Plaintiff was reporting to Burrell, and Joby Weeks who at the time was

11   working with Burrell on the development of the project.  In or around the middle of November,

12   Plaintiff was informed that the entities that would be formed for the project would be formed

13   under the name BitPower.

14       51.    The CryptoWatt Defendants were at the time looking to lease land next to an

15   electrical substation in or around Anaconda, Montana and were planning on doing a "greenfield

16   buildout."  However, in or around November 2017, the CryptoWatt Defendants heard that there

17   was an abandoned electrical substation that was coming onto the market near Butte, Montana and

18   they entered into negotiations to purchase the facility for the purpose of mining bitcoin and

19   hosting bitcoin mining equipment.  The facility was an old electrical substation for MSE

20   Technology Applications, Inc. – a 1970's joint venture between the federal government and a not-

21   for-profit group to test "clean coal technology" that ultimately folded.  The CryptoWatt

22   Defendants succeeded in acquiring the facility in or around early January 2018 for approximately

23   $4.5 million.

24       52.    In the course of a few weeks in early November, 2017, Plaintiff traveled to various

25   countries including Malaysia, Australia and Republic of Georgia to look at other bitcoin sites for

26   purposes of researching the projects.  Following that whirlwind tour, Plaintiff returned to the

27   United States and engaged in meetings with Burrell and Washington who began negotiating

28   certain terms for Plaintiff's ongoing work.  In or around November 2017, Plaintiff met with

CryptoWatt Defendants' representative Rick Tabish at the facility in Butte, Montana to review the site and determine whether the site would be acceptable for the project.

53.     In addition, Plaintiff commenced work in conjunction with various contractors to engineer the site from an energy perspective and to structure the architecture for the placement of the servers and the racks so that the space could be optimized for operations.  He also was responsible for designing the racks.  The pace at which the CryptoWatt Defendants were forcing operations was feverish.  Burrell and his cohorts were demanding round the clock work from everyone in order to get the plant up and running.  Burrell had, among other things, obtained financing, leveraging BDI and or its assets and was determined to force the plant into operation within weeks.  At or around that time, Plaintiff suggested that the CryptoWatt Defendants retain contractors to assist in the development of the plant.  Von Graf at that time suggested that he and TokenBlock be retained to assist given the pressure of work required to complete the plant build out and Von Graf suggested that he would work with the electrical engineers while Plaintiff focused on the general architecture and design.

54.     Ultimately, Plaintiff and Kosednar worked on and designed the racks and breaker systems. Von Graf was hired to work on procuring wires and cables and later on staffing for the site.  All of this was to be done by Tokenblock but unknown to Plaintiff, Von Graf created a new company and funneled money into the new company instead of Tokenblock.  Plaintiff and the lawyers retained by the CryptoWatt Defendants engaged in the negotiations with various energy companies for a power contract and then after the selection of the power company, Plaintiff and the lawyers negotiated the contract.  The electrical upgrade for the substation was to be accomplished by Barnard Construction and Tabish became what was essentially a general contractor on site coordinating with the people on the ground as the buildout was done.  Tabish also dealt with permitting locally as well as cleanup of the site when first purchased.  Burrell and Washington were directing all operations and contributing financially to the buildout either through cash or equipment.

55.     Neither Burrell, Washington or anyone else associated with the CryptoWatt Defendants had sufficient technical knowledge to build the plant and thus needed Plaintiff to accomplish their goal to build a bitcoin plant that would be operational quickly and efficiently.

56.     Throughout the period from November to December 2017, Plaintiff spent countless hours working day and night to engineer the bitcoin plant.  Among other things Plaintiff accomplished the following during this period: the negotiation of power contracts to run the plant, the complete design and buildout of the physical infrastructure for the servers, the design and development of the internal portion of the plant so as to allow the operation to run efficiently.

57.     In or around early December 2017, Burrell and Washington purportedly formed BitPower to hold title to the facility and operate the Bitcoin plant.  Burrell and Washington represented to Plaintiff that ownership of the mining equipment would be placed in an entity entitled T&C.  In addition, Burrell and Washington formed BitPower Management as the holding company for BitPower.  CryptoWatt Defendants represented to Plaintiff that he would be provided with an employment contract with BitPower that would provide him with an annual salary, a signing bonus and shares of the profits realized from the operation of the plant.  The signing bonus was intended to act as payment for services provided in November and December of 2017.

58.     Throughout November and the beginning of December 2017, Plaintiff repeatedly asked Burrell to provide him with the promised employment contract. CryptoWatt Defendants repeatedly assured Plaintiff that the agreement would be forthcoming.  Based on those assurances, Plaintiff continued to provide services critical to the development of the bitcoin plant.

59.     During this period, Plaintiff worked primarily in Los Angeles with occasional trips to Burrell's private residence in Colorado for meetings and trips to Montana to examine the plant facility.

60.     Although Plaintiff repeatedly asked for a written agreement, the CryptoWatt Defendants ignored his requests.  Ultimately the CryptoWatt Defendants revised and modified a form agreement that Plaintiff had submitted to them in mid-December 2017.  But the CryptoWatt Defendants made changes that were not consistent with the parties' oral agreement.  Burrell presented Plaintiff with a written agreement dated December 31, 2017 (the "December 31

Agreement"), that referenced a start date of December 31, 2017 – even though Plaintiff had by then provided hundreds of hours of work on the project. Burrell made clear that the December 31 Agreement was a "take it or leave it." Moreover, Burrell falsely represented to Plaintiff that Plaintiff would receive more from the operations of the business under the December 31 Agreement, claiming that the CryptoWatt Defendants were planning on an Initial Public Offering.

61.    The December 31 Agreement provided Plaintiff with a base salary of $240,000 per year for which Defendants were to be responsible for payroll deductions and all required withholdings; a signing bonus of $100,000 "upon the successful installation of the first order;" options of "8% shares of the Membership Units made up of BitPower LLC which will vest immediately upon execution"; and 5% of "Tango and Cash investments or BitPower Investment Partners ('InvestCo') or investments in bitcoin mining equipment, services or programs or distributions paid back after the principal investment is made up from the initial investment."  The latter provision was to provide Plaintiff with an ownership interest in the BitFury and BitMain equipment that Burrell and Washington had purchased.

62.    The December 31 Agreement was purportedly between Plaintiff and BitPower, LLC, which was supposed to have been formed for the purpose of operating the bitcoin plant.  The "Membership Unit Awards" identified in the agreement were subject to and in accordance with an operating agreement of BitPower and BitPower Investment Partners.  Although Plaintiff requested a copy of the operating agreement, Burrell and Washington did not provide one. To this date, Plaintiff has never received a copy of the operating agreement between BitPower and BitPower Investment Partners that included his ownership shares.  However, Plaintiff was repeatedly assured that his ownership interest had been properly documented in that operating agreement.

63.    Plaintiff was effectively told that the Agreement was "take it or leave it."  By then, Plaintiff had invested a significant amount of time in the project and he had yet to be paid any money for his services.  Forced to accept the agreement, Plaintiff signed the December 31 Agreement with the understanding that he would be paid for all work he performed both prior to and after execution of the agreement.

64.     Plaintiff continued to invest a significant amount of his time and energy into the development of the bitcoin plant.  Throughout the period from January 2018 to February 2018, Plaintiff worked day and night.  The CryptoWatt Defendants were driving hard to have the bitcoin plant up and running by the end of February 2018.  And Plaintiff's services were integral to the accomplishment of that goal.

65.     When Tokenblock was brought in to assist, Von Graf knew at all material times that Plaintiff had an agreement with the CryptoWatt Defendants for his services that was independent of the agreement between Tokenblock and the CryptoWatt Defendants.  Von Graf further knew that Plaintiff would receive significant benefits as a result of his ownership interest in CryptoWatt.  At all material times, as an owner, officer and director of Tokenblock, Von Graf owed a fiduciary duty not only to Tokenblock but to Plaintiff who was a co-owner and officer and director of Tokenblock.

66.     Unknown to Plaintiff, after he brought Von Graf in to assist with the project, the CryptoWatt Defendants and Von Graf began discussions which were aimed at cutting Plaintiff out of the ongoing running of the bitcoin plant.

67.     In or around January 2018, Plaintiff was informed that that amendments were made to the corporate documents forming BitPower to change the name to CryptoWatt Mining and further to change the name of BitPower Management to CryptoWatt Management.  Plaintiff was unaware that the CryptoWatt Defendants were also forming other companies. On information and belief, this was done to divert funds away from the entities in which Plaintiff purportedly held an ownership interest and to hide his ownership.

68.     On or about January 26, 2018, Plaintiff was first informed by Burrell that Plaintiff's membership units were never included in the operating agreements as required by the December 31 Agreement.  Plaintiff was told that this would be done and that an amended agreement would be prepared.  In an email dated January 26, 2018, Plaintiff wrote to John Fullerton of BDI, ccing Burrell and stating: "Can you send me the CryptoWatt and Host Co operating agreements that Kevin signed?  In addition, I just got off the phone with Dan and it sounds like we didn't include

my member units in the first agreement.  He recommended we put together an amended agreement with my member units respectively."

69.     Mr. Fullerton wrote back to Plaintiff on January 26, 2018 the following:  "Evan:  Please find the executed CryptoWatt Management, LLC and CryptoWatt, LLC operating agreements attached.  Kevin only signs the Management level.  The HostcoLLC Agreement has not been finalized and will be signed by BMH and CryptoWatt.  I will need direction as to your units as it has always been communicated as 50/50.  Will these units be in CryptoWatt Management LLC?"  In response Plaintiff wrote:  "8% of CryptoWatt, And 5% of investments after capital repayment out of the T&C / investment co."  And, Mr. Fullerton wrote back "Understood, that will not be too difficult to amend."

70.     Based on the foregoing, Plaintiff understood that his interests were adequately documented confirming his interests in CryptoWatt and the T&C investment company.  Unknown to Plaintiff, his interests were never documented and the CryptoWatt Defendants have refused to acknowledge his interests or to pay Plaintiff any of the funds due to him.

71.     In addition to all of his work in November and December 2017, Plaintiff worked tirelessly throughout January and February 2018 and ultimately as a result of his efforts, the bitcoin plant successfully came on line the last week of February 2018/first week of March.  Prior to or at that time, there were numerous orders that had been placed clearly satisfying the provision in the December 31 Agreement that Plaintiff be paid a "signing bonus of $100,000 [] upon the successful installation of the first order."

72.     After the CryptoWatt Defendants knew that the plant would be operational, the CryptoWatt Defendants suddenly and without warning forced Plaintiff off the bitcoin plant.  Plaintiff continued to work, from Los Angeles, on the bitcoin plant's website and on branding and business development. About 30 days later, on April 3, 2018, Plaintiffs' contract was terminated.

73.     At the time of his termination, the CryptoWatt Defendants had only paid Plaintiff a total of $40,000, although he was owed far more, including, but not limited to, the $100,000 signing bonus and the salary owed for his work through April 3, 2018 – the date that the

1   CryptoWatt Defendants represented his employment was contractually concluded.  Further, the

2   CryptoWatt Defendants failed entirely to make payments in accordance with the terms of the

3   December 31 Agreement which required that the defendants pay Plaintiff his salary less applicable

4   payroll deductions and to make all required withholdings.  The CryptoWatt Defendants did not

5   pay Plaintiff for the work that he performed from October to December, 2017.  Nor have the

6   CryptoWatt Defendants compensated Plaintiff for any of the ownership interests he was due from

7   CryptoWatt Mining or the interest in T&C.

8   <u>**FIRST CAUSE OF ACTION**</u>

9   **(Breach of Contract as to Defendants BitPower, LLC, BitPower Management, LLC,**

10   **CryptoWatt Mining, LLC, Tango & Cash, LLC, Burrell Diversified Investments LLC,**

11   **Daniel Burrell, Kevin Washington,**

12   **and DOES 1 through 50)**

13   74.     Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through

14   73 above, as if fully set forth herein. The above-referenced defendants shall be collectively and

15   separately referred to in this cause of action as "Defendants."

16   75.     At all times material hereto, there existed as between Plaintiff and Defendants, an

17   agreement whereby Defendants promised to pay Plaintiff for his services in accordance with the

18   terms of the December 31 Agreement. Among other things, the terms of the agreement required

19   that Defendants pay Plaintiff an annual salary less applicable payroll deductions and all required

20   withholdings in bi-weekly installments, a signing bonus of $100,000 upon successful installation

21   of the first order; and options of 8% shares of the Membership Units made up of BitPower; 5% of

22   investments in bitcoin mining equipment, services or programs or distributions paid back after the

23   principal investment is made up from the initial investment. A true and correct copy of the

24   December 31, 2017 Agreement is attached hereto as **<u>Exhibit 1</u>**.

25   76.     The Agreement was in all respects a contract of adhesion. Plaintiff continually

26   requested an agreement from the moment that he commenced providing services to the

27   Defendants in or around November 2017 and Defendants continually promised him an

28   agreement.  In consideration of those promises, Plaintiff commenced working on the bitcoin

plant and by December 31, 2017 had provided extensive services for which he had not been paid. Plaintiff had no option but to sign the Agreement when Defendants provided it to him on December 31 in order to ensure that he was paid for the services that he had rendered. Clauses in adhesion contracts giving the stronger party, the drafter, discretionary rights to change the deal must be exercised in good faith, and the conduct must be objectively reasonable consistent with the reasonable expectations of weaker parties.

77.     Plaintiff was effectively forced to execute the Agreement on December 31, 2017 in order to ensure that he received payment for the services that he had provided and to receive the benefits that he had been promised. At all times material hereto, Plaintiff performed all obligations that he was required to perform under the December 31 Agreement. Plaintiff engineered, built and completed the bitcoin plant which became operational in or around late early-March 2018.

78.     Plaintiff did nothing to justify Defendants terminating him for "cause" as defined in the agreement and Plaintiff did not resign (nor was he terminated) for "good reason." Rather, Defendants unilaterally and without cause terminated Plaintiff on or about April 3, 2018, and thereafter sought to force him to sign another agreement to rescind the December 31 Agreement. The "Rescission Agreement and Mutual Release" ("Rescission Agreement"), incorrectly stated that the December 31 Agreement "contains material mistakes and errors" and that the December 31 Agreement was "not in accord with the parties' common intention" and that the employment relationship allegedly never commenced. Further, Defendants sought to force Plaintiff to sign the Rescission Agreement which also incorrectly stated that Plaintiff had received all payments and benefits owed to him so as to obtain a release by Plaintiff of all his claims against the Defendants. Plaintiff refused to sign the Rescission Agreement even though Burrell told him he would "rip [Plaintiff's] head off if he didn't sign" the Rescission Agreement. To date, Plaintiff has never signed the Rescission Agreement.

79.     At all material times, Plaintiff resided in Los Angeles, California and performed a significant amount of his duties in a California. Although the December 31 Agreement provided ambiguously that the "location" was "Butte, Montana. Aspen, Colorado," at all

material times, Plaintiff worked primarily out of Los Angeles, California and Defendants were well aware of that fact throughout the period that Plaintiff performed services for the Defendants.

80.    Defendants breached the contract by failing to pay Plaintiff for his services including failing to pay the $100,000 signing bonus and failing to provide options of 8% shares of Membership Units of CryptoWatt and 5% of T&C or CryptoWatt Investment or investments in bitcoin mining equipment, services or programs or distributions as described above.  Moreover, Defendants failed to make the necessary withholdings for taxes with respect to the limited payments they made to Plaintiff, as they were contractually required to do.

81.    As a result of Defendants' breach, Plaintiff has been damaged in an amount to be established at trial.

**SECOND CAUSE OF ACTION**

**(Breach of the Implied Covenant of Good Faith & Fair Dealing as to Defendants BitPower, LLC, BitPower Management, LLC, CryptoWatt Mining, LLC, Tango & Cash LLC, Daniel Burrell, Kevin Washington, Burrell Diversified Investments LLC**

**and DOES 1 through 50)**

82.    Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 81 above, as if set forth fully herein. The above-referenced defendants shall be collectively and separately referred to in this cause of action as "Defendants."

83.    Both parties to an employment relationship have a duty not to do anything that prevents the other party from receiving the benefits of their agreement. Good faith means honesty of purpose without any intention to mislead or to take unfair advantage of another.  Generally speaking, this means being faithful to one's duty or obligation.

84.    Plaintiff and Defendants entered into a written employment contract and Plaintiff substantially performed all of the duties required of him under the contract.

85.    Defendants promised Plaintiff that they would provide him with a salary, signing bonus, options of shares of Membership Units and a percentage of the investments as described above.  Despite making this written promise, Defendants have and continue to fail to pay Plaintiff

1  the signing bonus, salary owed to Plaintiff, the options or the percentage of investments as

2  described above.

3        86.    Defendants' conduct was a direct result of Defendants' failure to act fairly and in

4  good faith and to comply with the terms of the contract.

5        87.    Further, Plaintiff is informed and believes and thereon alleges that Defendants

6  engaged in a course of conduct that was intended to oppress and dissuade Plaintiff from seeking

7  the benefits due to him under the contract, including by demanding that Plaintiff sign a "rescission

8  agreement" that would effectively have rescinded the December 31 Agreement.

9        88.    Defendants have refused to fulfill their obligations under the December 31

10  Agreement and their refusal has been done with a conscious disregard for the rights of Plaintiff.

11  These acts were done with the knowledge and approval and ratification of Defendants and each of

12  them and each of their officers, directors and other managing employees.

13        89.    As a direct and proximate result of the aforementioned unreasonable and bad faith

14  conduct of Defendants, Plaintiff has suffered, and will continue to suffer in the future, damages,

15  plus interest, and other economic and consequential damages, for a total amount to be shown at the

16  time of trial.

17  **THIRD CAUSE OF ACTION**

18  **(For Fraud as to Defendants Cryptowatt Mining LLC, Bitpower, LLC, Bitpower**

19  **Management, LLC, Bitpower Investment Partners, LLC,  Burrell Diversified Investments**

20  **LLC, Tango & Cash, LLC, Cryptowatt Management, LLC, Daniel Burrell, Kevin**

21  **Washington and DOES 1 through 50)**

22        90.    Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through

23  73 above, as if fully set forth herein. The above-referenced defendants shall be collectively and

24  separately referred to in this cause of action as "Defendants."

25        91.    Defendants, including Burrell and Washington, deliberately made false and

26  misleading statements to Plaintiff that they would provide pay him for his services and further that

27  they would insure that he receive a bonus, options of  Membership Units, revenues from mining

28

equipment, and a percentage of the profits of the bitcoin plant.  At the time that Defendants made those statements they knew that they were false.

92.     Defendants intended to induce and did induce Plaintiff to rely on their misrepresentations so that Plaintiff would expend extensive efforts and work necessary to design and develop the Bitcoin plant and to get the plant up and running.  Moreover, Defendants knew that Plaintiff would rely on the false and misleading statements in working to engineer, design and complete the plant.

93.     Unaware that Defendants had embarked upon the scheme to obtain the benefits of Plaintiff's work on the bitcoin plant without any intention to pay him, Plaintiff justifiably relied on Defendants' false and misleading statements and thus was induced into providing extensive services that led to the completion and operation of the bitcoin plant.

94.     Had Plaintiff known the true facts regarding the Defendants' scheme, Plaintiff would not have worked on the bitcoin plant and would have declined to expend time and money assisting in the development of the plant.

95.     As a direct and proximate result of Defendants' fraudulent misrepresentations, Plaintiff has suffered injury and substantial damage in an amount estimated to be well in excess of $20 million.  The precise amount of Plaintiffs' damages is not known at this time but it shall be proven at trial.

96.     Defendants' fraudulent conduct was undertaken with a conscious disregard of the rights and interests of Plaintiff, and for the purpose of enriching themselves and jeopardizing Plaintiff's financial well-being.  In making the foregoing material misrepresentations, omissions of material fact and in undertaking the foregoing wrongful acts, Defendants acted maliciously, oppressively and with the intent to defraud Plaintiff.  Plaintiff is, by reason thereof, entitled to recover punitive and exemplary damages in an amount sufficient to punish and to make an example of Defendants.

**FOURTH CAUSE OF ACTION**

**(For Negligent Misrepresentation Against Defendants Cryptowatt Mining LLC, Bitpower, LLC, Bitpower Management, LLC, Bitpower Investment Partners, LLC,  Burrell Diversified Investments LLC, Tango & Cash, LLC, Cryptowatt Management, LLC, Daniel Burrell, Kevin Washington and Does 1-50)**

97.     Plaintiff realleges and incorporates by reference paragraphs 1 through 73 of the Complaint. The above-referenced defendants shall be collectively and separately referred to in this cause of action as "Defendants."

98.     Throughout the period from November 2017 through April 3 2018, Defendants made representations to Plaintiff regarding the benefits that he would earn by providing services for the development of the bitcoin plant.

99.     Defendants recklessly and/or negligently made the foregoing false and misleading statements without reasonable grounds for believing them to be true.

100.     Defendants intended to induce Plaintiff to rely on the foregoing statements and/or representations, and/or Defendants knew that Plaintiff would rely on the foregoing statements and/or representations in making decisions to continue to work to build the bitcoin plant.

101.     Plaintiff justifiably relied on Defendants' statements and were induced to work on the plant and forego other employment.

102.     Had Plaintiffs known the true facts regarding the Defendants' scheme, Plaintiff would not have agreed to provide any services, nor would he have worked to develop the bitcoin plant.

103.     As a direct and proximate result of Defendants' negligent misrepresentations and/or omissions, Plaintiff has suffered injury and substantial damage in an amount estimated to be in excess of $20 million.  The precise amount of Plaintiff's damages is not known at this time but it shall be proven at trial.

**FIFTH CAUSE OF ACTION**

**(For Recovery of Unpaid Wages Against Defendants BitPower, LLC, BitPower Management, LLC, CryptoWatt Mining, LLC, Tango & Cash LLC, Daniel Burrell, Kevin Washington, Burrell Diversified Investments LLC and Does 1-50)**

104.    Plaintiff incorporates herein and by reference each and every allegation contained in Paragraph 1 through 73, inclusive, of this Complaint as if fully set forth herein. The above-referenced defendants shall be collectively and separately referred to in this cause of action as "Defendants."

105.    Pursuant to the December 31, 2017 Agreement between Plaintiff and the CryptoWatt Defendants, the CryptoWatt Defendants are required to pay Plaintiff for his services in designing and building the bitcoin plant in accordance with the agreement.

106.    In addition, Plaintiff is entitled to compensation and other amounts specified in the December 31 Agreement.

107.    Effective as of April 3, 2018, Defendants gave notice that they were terminating Plaintiff's services.

108.    As of the effective date of his termination, Defendants had only paid Plaintiff $40,000 and has failed and refused to pay any of the additional amounts due to him for his work on the bitcoin plant in accordance with the December 31 Agreement.

109.    Defendants' failure to pay the full amount due to Plaintiff on termination violates the provisions of Labor Code § 201.

110.    There is now due and owing to Plaintiff a sum in an amount to be proven at trial. Defendants have failed and refused, and continue to fail and refuse, to pay Plaintiff's wages.

111.    Pursuant to Labor Code § 218.5, Plaintiff requests the Court award Plaintiff reasonable attorneys' fees and costs incurred by him in this action. Pursuant to Labor Code § 203, Plaintiff requests that the Court award penalties and interest against Defendants for their willful failure to pay wages of an employee who is discharged.

**SIXTH CAUSE OF ACTION**

**For Intentional Interference with Contract**

**Against Defendants Tokenblock, Von Graff and Does 51-100**

112.     Plaintiffs incorporate herein by reference each and every allegation contained in Paragraphs 1 through 73, inclusive, of this Complaint as if fully set forth herein. The above-referenced defendants shall be collectively and separately referred to in this cause of action as "Defendants."

113.     At all relevant times, Defendants knew of the existence of the December 31 Agreement between Plaintiff and the CryptoWatt Defendants, as described above.

114.     Defendants further knew that Plaintiff's work was integral to the development of the bitcoin plant and knew that in order for the plant to maintain operations it required the work of individuals like Plaintiff with the technological ability to maintain the plant.  Defendants further knew that Plaintiff's expertise was necessary to get the plant operating.

115.     Because of this, Defendants knew at all relevant times that the CryptoWatt Defendants required Plaintiff's services to get the plant operating and to maintain the operations of the bitcoin plant but Defendants also knew that they had the ability to maintain the plant once it was operational.

116.     Plaintiff is informed and believes and thereon alleges that in an effort to interfere with Plaintiff's rights under the December 31 Agreement, Defendants began to undercut Plaintiff to the CryptoWatt Defendants in an attempt to convince the CryptoWatt Defendants to terminate Plaintiff once the plant was operational so that Defendants could take over and benefit from the lucrative contract that Plaintiff had with the CryptoWatt Defendants.

117.     Plaintiff was asked to leave the project site on February 23, 2018 and his role on the bicoin project was diminished on February 28, 2018. He was subsequently terminated on April 3, 2018, by the CryptoWatt Defendants. On information and belief, this was due to the interference by Defendants, who convinced the CryptoWatt Defendants to terminate Plaintiff under the ruse that Defendants would maintain the plant's operations and that the CryptoWatt Defendants could avoid paying Plaintiff the monies he was owed.

118.     Defendants engaged in the conduct alleged herein with the intent to harm Plaintiff financially and to induce the CryptoWatt Defendants to violate the December 31 Agreement, and/or to make the contractual relationship between Plaintiff and the CryptoWatt Defendants less financially lucrative to Plaintiff.

119.     As a proximate result of the conduct of Defendants as alleged herein, Plaintiff was damaged in an amount in excess of $20 million dollars, the exact amount of which will be proven at time of trial.  When Plaintiff has ascertained the full amount of his damages, he will seek leave of Court to amend this Complaint accordingly.

120.     The conduct of Defendants as alleged herein was purposeful and intentional and was engaged in for the purpose of depriving Plaintiff of property or legal rights or otherwise causing injury, and was despicable conduct that subjected Plaintiff to cruel and unjust hardship in conscious disregard of his rights, and was performed with fraud, oppression or malice so as to justify an award of exemplary or punitive damages against such Defendants in an amount according to proof at trial.

**SEVENTH CAUSE OF ACTION**

**(For Intentional Interference With Prospective Economic Advantage**

**Against Defendants Tokenblock, Von Graff and Does 51-100)**

121.     Plaintiffs incorporate herein by reference each and every allegation contained in Paragraphs 1 through 73, and 112 through 120 inclusive, of this Complaint as if fully set forth herein. The above-referenced defendants shall be collectively and separately referred to in this cause of action as "Defendants."

122.     Prior to engaging in the aforementioned conduct, Defendants were fully aware that Plaintiff had business relationships with the CryptoWatt Defendants which was economically-advantageous to Plaintiff.

123.     Defendants engaged in the conduct alleged above with the intent to interfere with and/or destroy the economically-advantageous relationships between Plaintiff and the CryptoWatt Defendant and to make that relationship less financially lucrative for Plaintiff. The conduct of

1  these Defendants was independently wrongful in that Defendants owed Plaintiff a fiduciary duty

2  as a result of their relationship and ownership of Tokenblock.

3      124.    As a proximate result of the conduct of Defendants as alleged herein, Plaintiff has

4  been damaged in an amount in excess of $20 Million, the exact amount of which will be proven at

5  the time of trial. When Plaintiff has ascertained the full amount of his damages, he will seek leave

6  of Court to amend this Complaint accordingly.

7      125.    The conduct of Defendants as alleged herein was purposeful and intentional and

8  was engaged in for the purpose of depriving Plaintiff of property or legal rights or otherwise

9  causing injury, and was despicable conduct that subjected Plaintiff to cruel and unjust hardship in

10  conscious disregard of its rights, and was performed with fraud, oppression or malice so as to

11  justify an award of exemplary or punitive damages against such Defendants in an amount

12  according to proof at trial.

13                          **PRAYER FOR RELIEF**

14          Wherefore, Plaintiff respectfully requests that the Court enter judgment in his favor and

15  against Defendants as follows:

16          a.   Awarding Plaintiff damages in an amount to proven at trial;

17          b.   Awarding Plaintiff pre-judgment and post-judgment interest as provided by law;

18          c.   For punitive damages in an amount to be proven at trial;

19          d.   Awarding Plaintiff attorneys fees, fines and penalties in accordance with the

20               Labor Code;

21          e.   Awarding Plaintiff costs of suit herein incurred; and

22          f.   Awarding Plaintiff such other and further relief as may be just and proper.

Dated:  July 31, 2020

                                Gretchen M. Nelson
23                              Gabriel S. Barenfeld
                                NELSON & FRAENKEL LLP
24

25                              Jules G. Radcliff, Jr.
                                RADCLIFF & MAYES LLP
26

27          By: *Gabriel Barenfeld*
                                Gretchen M.  Nelson
28                              Gabriel S. Barenfeld
                                Attorneys for Plaintiff

1

2                                    **JURY DEMAND**

3           Plaintiff demands a trial by jury on all issues so triable.

4      Dated:  July 31, 2020                  NELSON & FRAENKEL LLP

5                                             RADCLIFF & MAYES LLP

6

7                                      By: *Gabriel Barenfeld*

8                                          Gretchen M. Nelson
                                           Gabriel S. Barenfeld
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIT 1 TO FIRST AMENDED COMPLAINT**

**PRIVATE AND CONFIDENTIAL**

Date: December 31, 2017

Evan Birenbaum
4213 Scandia Way
Los Angeles, CA 90013

Dear Evan,

On behalf of BitPower LLC. ("Company") and its management team, I am delighted to offer you the position of Chief Operating Officer.  This offer of employment is conditioned upon the receipt of proof of your legal eligibility to work in the United States, and other conditions stated below.  This letter embodies the terms of our offer to you:

1.     **Position:** Chief Operating Officer

2.     **Initial Reporting Relationship:** You will report to the Chief Executive Officer of the Company.

3.     **Location:** Butte, Montana. Aspen, Colorado.

4.     **Start Date:** December 31, 2017

5.     **Salary:** As approved by the Board of Directors of the Company ("Board"), your base salary will be $240,000 per annum. In each case, your salary will be paid, less applicable payroll deductions and all required withholdings, in bi-weekly installments (or such other regular payroll period of the Company) in accordance with the Company's standard payroll practices for salaried employees.

6.     **Membership Unit Awards:** You will be granted units of the LLC's Membership Units of the Company ("Membership Units") under the Company's Equity Incentive Plan as follows:

   - Options are granted to comprise of 8% shares of the Membership Units made up of BitPower LLC ("HostCo"), which will vest immediately upon execution of this contract.
   - 5% of "Tango and Cash" investments or BitPower Investment Partners ("InvestCo") or investments in bitcoin mining equipment, services or programs or distributions paid back after the principal investment is made up from the initial investment.
   - Signing bonus of $100,000 paid upon the successful installation of the first order.

   These Membership Unit Awards (a) are subject to and in accordance with the BitPower LLC and BitPower Investment Partners operating agreement or "Tango and Cash" investments, services, programs and mining equipment, (b) can be transferred to family members and trusts as stated in companies operating agreement.

   In the event of a Change of Control and termination with or without cause or for good reason, the following will apply with respect to the Membership Unit Awards:

   (i) if your employment is terminated without Cause (as defined below) by Company (or a successor, if appropriate) or you resign for Good Reason (as defined below) in connection with or within twelve (12) months following the consummation of a Change of Control or other employment changes, then one hundred percent (100%) of the unvested Membership Units shall vest effective immediately upon the termination or change of your employment.

BitPower LLC. CONFIDENTIAL

1

As used herein, the following terms will have the following meanings:

"Cause" means any of the following: (A) conviction or plea of nolo contendere of any felony or any crime involving moral turpitude or dishonesty; (B) fraud, dishonesty or misuse of Company's funds or other Company resources to your benefit; (C) demonstrated and material neglect of duties; (D) intentional and willful refusal to follow lawful directives of the Board and/or Chief Executive Officer; (E) willful commission of any material violation of any state or federal laws relating to the workplace environment or (F) the use of alcohol or illegal drugs, materially interfering with the performance of your employment obligations. Any termination pursuant to subsection (C) herein requires that Company provide you a reasonable opportunity, of not less than ten (10) days, to cure the basis of the alleged Cause.

"Good Reason" means any one of the following: (A) assignment to you of duties and responsibilities that are materially less than or otherwise not in keeping with your then current duties and responsibilities, (B) a significant reduction in your base salary (except as part of a general change in base salary for all similarly situated executives); (C) relocation of your principal work location to a location more than a fifty (50) mile radius of your principal work location; or (D) by mutual agreement between Company and you.

7.  **Initial Responsibilities**: Your initial responsibilities will include the following:

- Collaborate with the Company's leadership team on task prioritization and activities;
- Work with the Company's leadership team on regular briefings, updates on work progress, and overall company performance, etc.;
- Lead and support the Company's (a) operations and compliance; (b) overall success of the Company's goals and objectives; and (c) overall business strategy and day-to-day operations;
- Participate in investment discussions related to BitPower LLC and "Tango and Cash" business, business strategy, or programs and services;
- Lead and support the Company's overall platform strategy and market expansion efforts, business operations; and
- Other responsibilities as assigned.

8.  **Paid Time Off:** In addition to federal and Montana state holidays for which you will be entitled to paid time off, you will be entitled to up to ten (10) days of paid time off per calendar year (pro-rated based on your actual start date).

9.  **Benefits:** You are eligible to participate in benefits consistent with the Company's policies, including medical, dental and vision. You will also be eligible to participate in benefits provided to other executives of the Company. Lastly, you will also be eligible to participate in the Company's 401(k) and other benefits if, when and as implemented by the Company.

10. **Period of Employment:** Your employment with the Company will be "at will," meaning that either you or the Company can terminate your employment at any time and for any reason, with or without cause. Any contrary representations which may have been made to you are superseded by this offer. This is the full and complete agreement between you and the Company on this term. Although your job duties, title, compensation and benefits, as well as the Company's personnel policies and procedures, may change from time to time, the "at will" nature of your employment may only be changed in an express written agreement signed by you and a duly authorized officer of the Company. You and the Company agree to provide the other party at least thirty (30) days prior notice of any termination of or resignation from employment, as the case may be.

11. **Reference Checks:** Your offer is contingent upon the satisfactory completion of reference checks. Upon accepting this offer, you are authorizing the Company to contact your references. We may request additional information from you to engage in a background check as well.

12. **Previous Employment:** Your offer is also contingent upon your certification that there are no contractual conditions that will prevent you from performing the responsibilities of this offered position. Having left your former employer, it is expected that you did not take any of your former employer's (a) files, (b) clients or customer files or lists, (c) vendor, contractor or consultant files or lists; (d) employee files or any other property (including confidential information or trade secrets) that belongs to your previous employer. If you took any of these types of files from your former employer, then it is required that you return them to your former employer immediately and before accepting this offer.

Furthermore, it is expected that when you left your former employer, if you had a non-solicitation agreement with that employer, that you did not (x) initiate contact or solicit your former employer's clients, or customers for the purpose of encouraging them to terminate their relationship with your former employer, (y) initiate contact or solicit your former employer's vendors, contractors, or consultants for the purpose of encouraging them to terminate their relationship with your former employer and (z) initiate contact or solicit your former employer's employees for the purpose of encouraging them to terminate their employment with your former employer.

We also expect that coming to work for the Company you will not violate any Employment Agreement, Confidentiality Agreement, Covenant Not to Compete Agreement, or other agreement between you and any of your former employers. By signing below, you confirm that you are not in violation of any agreement or contract with any former employer.

13. **Amendment and Governing Law:** This letter may not be amended or modified except by an express written agreement signed by you and a duly authorized officer of the Company. The terms of this offer letter and the resolution of any disputes will be governed by the laws of the State of Montana, without giving effect to conflict of laws principles. Any action relating to this offer letter must be brought in the federal or state courts having jurisdiction and venue in or for the courts located in Missoula County, State of Montana, and the parties irrevocably consent to the jurisdiction of such courts.

14. **Entire Agreement:** This letter and the Confidential Information and Invention Assignment Agreement attached hereto contain all of the terms of your employment with the Company and supersede any prior or contemporaneous understandings or agreements, whether oral or written, between you and the Company.

15. **Arbitration:** You and the Company shall submit to mandatory and exclusive binding arbitration of any controversy or claim arising out of, or relating to, this agreement or any breach of this letter. Such arbitration shall held in the State of Montana, Missoula County, before a single neutral arbitrator, in accordance with the National Rules for the Resolution of Employment Disputes of the American Arbitration Association in effect at that time.

Prior to signing below, it is recommended that you consult with your own legal and other advisors concerning the matters set forth in this offer letter since it deals with important legal, financial and tax matters.

We hope that you find the foregoing terms acceptable. Please indicate your agreement with these terms and accept this offer by signing and dating both this letter and the enclosed Confidential Information and Invention Assignment Agreement and returning them to me.

This offer, if not accepted, will expire at 5:00 p.m. (Mountain time) on Friday, January 31, 2018. Should you have any questions, please do not hesitate to call me at (443) 799-2259.

Sincerely,

By:  Dan Burrell, CEO


The undersigned accepts the above employment offer and agrees that it contains the terms of employment with BitPower LLC and that there are no other terms express or implied.

By: _____          Dated: ___12/31/2017_____
Name:  Evan Birenbaum

## PROOF OF SERVICE

**COUNTY OF LOS ANGELES** )

)

**STATE OF CALIFORNIA** )

I, the undersigned, declare:

I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action; my business address is 601 So. Figueroa Street, Suite 2050, Los Angeles, California 90017.  On August 3, 2020, I caused to be served the foregoing document(s)

**FIRST AMENDED COMPLAINT FOR DAMAGES**

On the interested parties in this action by placing true copies thereof enclosed in sealed envelopes addressed as follows, with postage thereon fully prepaid in the United States Mail at Los Angeles, California:

_____ BY U.S. MAIL:
I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing.  Under that practice, it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid at Los Angeles, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

_____ BY PERSONAL SERVICE:
I caused to be delivered such envelope by hand to the offices of the addressee:

_____ BY FEDERAL EXPRESS OR OVERNIGHT COURIER

__x__ BY ELECTRONIC MAIL:
I caused to be delivered via electronic mail at the addresses listed below:

_____ BY TELECOPIER:
I served by facsimile at the numbers identified on the service list:

__X__ (STATE) I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on Monday, August 03, 2020 at Los Angeles, California.

_____
 Karina Torres
(Print or Type Name)

*Karina Torres*
_____
(Signature)

1

PROOF OF SERVICE

## SERVICE LIST

*Birenbaum v. Cryptowatt Mining LLC, et al.*

### Case No. 19STCV39029

| | |
|---|---|
| Stephen E. Ensberg<br>ENSBERG LAW GROUP<br>1609 W. Garvey Avenue North<br>West Covina, CA 91790<br>Telephone: (626) 813-3744<br>Fax: (626) 813-3886<br>Email: sensberg@aol.com | Attorney for Defendant Fred Von Graff |
| Jerry S. Phillips<br>LOEB & LOEB<br>10100 Santa Monica Blvd., Suite 2200<br>Los Angeles, CA 90067<br>Telephone: (310) 282-2177<br>Fax: (310) 919-3961<br>Email: jphillips@loeb.com | Attorney for Kevin Washington |
| Anand Sambhwani<br>KELLER/ANDERLE LLP<br>18300 Von Karman Ave., Suite 930<br>Irvine, CA 92612-1057<br>Telephone: (949) 476-8700<br>Fax: (949) 476-0900<br>Email: asambhwani@kelleranderle.com | Attorney for Defendants Dan Burrell and Burrell Diversified |

2