William A. Rossbach
bill@rossbachlaw.com
ROSSBACH LAW, P.C.
401 North Washington St.
Missoula, MT 59807-8988
Telephone: (406) 543-5156

Gretchen M. Nelson (PHV pending)
gnelson@nflawfirm.com
Gabriel S. Barenfeld (PHV pending)
gbarenfeld@nflawfirm.com
NELSON & FRAENKEL LLP
601 So. Figueroa Street, Suite 2050
Los Angeles, CA 90017
Telephone: 213-622-6469

Jules G. Radcliff Jr. (PHV pending)
jradcliff@radcliffmayes.com
RADCLIFF MAYES LLP
515 S. Flower St., 18th Floor
Los Angeles, California, 90071
Telephone: 213-788-5336

IN THE AMERICAN ARBITRATION ASSOCIATION

| | |
|---|---|
| EVAN BIRENBAUM.<br>        Claimant,<br><br>v.<br><br>CRYPTOWATT MANAGEMENT,<br>LLC; CRYPTOWATT MINING,<br>LLC; CRYPTOWATT<br>INVESTMENT PARTNERS, LLC;<br>BITPOWER MANAGEMENT, LLC;<br>BITPOWER, LLC; BITPOWER<br>INVESTEMENT PARTNERS, LLC;<br>ATLAS POWER, LLC; ATLAS<br>POWER HOLDINGS, LLC; and<br>DOES 1 through 100.<br>        Respondents. | Case No.:<br><br>**STATEMENT OF CLAIM AND DEMAND FOR ARBITRATION** |

STATEMENT OF CLAIM

**Exhibit D**

Claimant Evan Birenbaum ("Claimant" or "Birenbaum") brings this claim against Respondents CryptoWatt Management, LLC; CryptoWatt Mining, LLC; CryptoWatt Investment Partners, LLC; Bitpower Management, LLC; Bitpower, LLC; BitPower Investment Partners, LLC; Atlas Power, LLC; and Atlas Power Holdings, LLC; and DOES 1 through 100 (together, "Respondents" or "CryptoWatt").

## I.   OVERVIEW

1.     This action stems from CryptoWatt's failure to pay Claimant, who was the chief operating officer of CryptoWatt's Bitcoin mining enterprise, the equity, revenue disbursements, and wages that he was owed. Claimant asserts claims for (1) breach of contract, (2) breach of the implied covenant of good faith and fair dealing, (3) fraud, (4) negligent misrepresentation, and (5) for recovery of unpaid wages.

2.     In or around 2017, Daniel Burrell ("Burrell") and Kevin Washington ("Washington")—who later founded CryptoWatt—began to explore plans to build a facility to mine bitcoins. Bitcoin is a digital "cryptocurrency" that is completely virtual.  Bitcoin networks (or nodes) are designed to verify transactions to the blockchain ledger by solving complicated equations and algorithms, which can be done at scale in large datacenters.

3.     Bitcoin, which was first developed into an economy in 2009, is larger than that of some of the world's nations.  The value of a Bitcoin has grown and fluctuated from pennies in its early days to more than $50,000 in 2021.

STATEMENT OF CLAIM

4.      Mining has become increasingly specialized and is now largely done professionally by companies that are able to build large data centers supplied by relatively inexpensive electricity in a cool climate.  The companies either purchase or host specialized computer hardware that runs 24/7 creating bitcoins.

5.      As the value of Bitcoin began to sore, Burrell and Washington started to procure bitcoin mining equipment from an individual who was heavily involved in bitcoin, Joby Weeks ("Weeks"). Burrell and Washington had limited, if any, knowledge on the building or running of a Bitcoin mining company, including how to setup the equipment, what equipment and infrastructure was needed, or the manner in which miners operate.  As a result, when Burrell and Washington started buying equipment from Weeks, Weeks flew Claimant to New Mexico to meet with Burrell to discuss the logistics of purchasing mining equipment and to provide details on how to set up a mining company, including technical, logistical and operational electrical requirements.

6.      Claimant provided critical input and information on such details. And from that discussion, the specifics of a plan were formed to build a data center. Burrell along with David Bennett, who was a financial analyst for Burrell Diversified Investments ("BDI") began modeling out financial projections to procure mining equipment and operate the equipment. During the meeting, Claimant provided the necessary insight into the preferred operation conditions for a data center and explained that New Mexico, Burrell's preferred location, was not ideal.  Washington had ties with Montana, and as a result, they decided to look to locate the facility in

3

STATEMENT OF CLAIM

Montana, where electricity is relatively cheap and the ambient temperature averages 45°.

7.      However, Burrell and Washington lacked the necessary technical and engineering skills to implement their plan. Claimant, on the other hand, was highly knowledgeable as to technical aspects of designing and operating the facility.  Burrell and Washington  reached out to Claimant and lured him into working for them to, among other things, (i) lead and support efforts to secure locations for the mining facility or facilities; (ii) locate and negotiate or provide integral support for negotiations regarding a contract for an appropriate facility to house the bitcoin mining computer hardware; (iii) lead and support discussions with an electrical company to supply power to the facility; (iv) hold discussions with energy retailers to schedule power purchases in the energy market; (v) work with general contractors to build critical infrastructure to supply power to the facility; (vi) lead and support efforts to architect and build out the facilities; (vii) provide technical leadership and design of the overall datacenter and hire staff or resources for ongoing operations; and (viii) design and install the hardware in such a manner to maximize space and available electricity and operate efficiently so as to successfully mine bitcoin.

8.      To set their plan in motion, Burrell, Washington, and BDI formed a Delaware limited liability company that they called BitPower, LLC to own and operate the bitcoin plant. Upon information and belief, Respondents at some point also formed another Delaware limited liability company entitled BitPower Management, LLC to be the manager and parent company of BitPower, LLC.  A few short months after forming the foregoing limited

STATEMENT OF CLAIM

liability companies, Burrell and Washington renamed BitPower, LLC, CryptoWatt Mining, LLC, and BitPower Management, LLC to CryptoWatt Management, LLC. On information and belief, Washington later renamed those entities to Atlas Power, LLC, and Atlas Power Holdings, LLC (together and separately, "Atlas Power").

9.     Upon information and belief, at all relevant times, unless otherwise stated, BitPower, LLC, BitPower Management, LLC, BitPower Investment Partners, LLC, CryptoWatt Mining, LLC, CryptoWatt Management, LLC, and CryptoWatt Investment Partners, Atlas Power, LLC, and Atlas Power Holdings, LLC (referred to herein together and separately, as "Respondents"), no matter the name, operated in the same manner, held title to the same property, had an identity of and ownership, and/or were the predecessors and/or successors in interest of one another.

10.     Throughout the time that Respondents were negotiating with Claimant, they knew full well that the only way to convince Claimant to work for them was to offer him a highly lucrative contract that would afford him a monthly salary, an ownership interest in the operation, revenues generated from the mining equipment, and a significant percentage of the ultimate profits that would be earned from the bitcoin mining facility.  Moreover, Respondents further knew that Claimant was the key to their ability to design and develop a successful mining operation, and without Claimant they would not be able to accomplish their goal.

11.     In or around early November 2017, Respondents convinced Claimant to commence work on the project with the promise of a contract that would afford Claimant a base salary and shares in the operating entity

STATEMENT OF CLAIM

as well as a percentage of the revenue to be earned from the mining equipment.  In reliance on verbal and written representations by Respondents to Claimant that they would provide him a written contract containing the foregoing terms, Claimant commenced work on the project in or around November 2017.  Nearly two months later, Respondents presented Claimant with contract terms which modified the original agreement to incorporate provisions that were less lucrative but provided for a base salary, a signing bonus (Respondents modified the terms of the bonus to alter the condition of payment), and "Membership Unit Awards" comprised of options and a percentage of the investments and distributions of revenue paid to the Respondents.  Respondents told Claimant that the agreement was "good and fair," but it was also "take it or leave it."  Since by that time Claimant had spent hundreds of hours working on the project, had provided Respondents with vital intellectual property information, and had not been paid any money, he was left with no alternative but to sign the agreement to recover the money he was owed and the earnings and equity to which he was entitled.

12.    Claimant worked countless hours developing, engineering and creating the bitcoin plant and by February 2018, he had succeeded in getting a portion of the plant to a position of being operational.  There were many technical challenges because, among other things, the power company was delaying approvals for major upgrades to the site, and equipment from vendors had to be delivered. Moreover, Burrell modified the schedule and pushed to have at least 3 megawatts powered up by specific dates, threatening Claimant and others if they did not meet his demands. Claimant

STATEMENT OF CLAIM

and the site contractors worked night and day and Claimant was able, with assistance, to engineer a temporary solution to meet Burrell's demand to have the site up and running by the end of February, even though Claimant informed Burrell that it would cause issues with the downstream schedule.

13.     Future investors toured the facility as a part of an effort to get the company to liquidity as fast as possible. During this period, Claimant was working with Washington and David Bennett of BDI on financial projections and was part of the group leading discussions with investors. Investors who visited the site mentioned they had never seen such an amazing achievement and provided a rough estimated value of the site of $450 million.

14.     On or about February 23, 2017, the Respondents suddenly and without warning forced Claimant off the bitcoin plant. Claimant continued to work, from Los Angeles, on the bitcoin plant's website and on branding and business development. About a month later, on April 3, 2018, Respondents terminated Claimants' contract.  Since then, the Respondents have refused and continue to refuse to pay or provide Claimant with the bonus or any of the revenue or shares and equity to which he was entitled.

15.     On information and belief, at all material times, Respondents, never intended to provide Claimant with the revenue, shares, or bonus but always intended to lure Claimant into providing the technical services necessary to get the bitcoin plant up and running and then terminate Claimant from employment so that Respondents could reap all of the rewards from the bitcoin mining operation and avoid paying Claimant the substantial compensation he was owed.

STATEMENT OF CLAIM

## II.   ARBITRABILITY AND VENUE

16.   On October 19, 2020, Claimant sued CryptoWatt Mining, LLC, and CryptoWatt Management, LLC, and others in the case styled *Birenbaum v. CryptoWatt Mining, LLC*, Los Angeles Superior Court Case No. Case No. 19STCV39029. That case arises from the dispute that gives rise to the current claims in this Arbitration. On October 19, 2020, the Honorable Steven J. Kleifield entered an order staying the lawsuit and compelling the case to arbitration in Missoula County, Montana, in accordance with Claimant's Employment Agreement ("Agreement") (attached hereto as **Exhibit 1**). Based on the October 19, 2020, Order, Claimant is filing this Claim in arbitration and is requesting that the hearing take place in Missoula County, Montana.

## III.   PARTIES

17.   Claimant Evan Birenbaum ("Birenbaum") is and at all times mentioned herein was a resident of Los Angeles County, California.

18.   Respondent Bitpower, LLC ("BitPower") is and at all material times was a limited liability company formed under the laws of the state of Delaware with its principal place of business located in Montana.  BitPower was purportedly formed in December 2017.  On information and belief, the original members of BitPower were Burrell, Washington and BDI.  In January 2018, BitPower was renamed CryptoWatt Mining.

19.   Respondent CryptoWatt Mining, LLC ("CryptoWatt Mining") is and at all material times was a limited liability company formed under the laws of the state of Delaware with its principal place of business located in

STATEMENT OF CLAIM

Montana.  In January 2018, BitPower, LLC was renamed CryptoWatt Mining.  On information and belief, the original members of CryptoWatt Mining were Burrell, Washington, and BDI.

20.    Respondent Bitpower Management, LLC ("BitPower Management") is and at all material times was a limited liability company formed under the laws of the state of Delaware with its principal place of business located in Montana.  BitPower Management was purportedly formed in or around December 2017. On information and belief, the original members of BitPower Management are Burrell and Washington.  In January 2018, BitPower Management was renamed CryptoWatt Management, LLC.

21.    Respondent CryptoWatt Management, LLC ("CryptoWatt Management"), is and at all material times was a Delaware limited liability company with its principal place of business located in Montana.  In or around January 2018, BitPower Management was renamed CryptoWatt Management.  On information and belief, BDI, Burrell, and Washington were the original members of CryptoWatt Management.

22.    Respondent CryptoWatt Investment Partners, LLC, ("CryptoWatt Investment") a Delaware limited liability company is and at all material times was a limited liability company formed under the laws of the state of Delaware with its principal place of business located in Montana. On information and belief, the company referred to in Respondent's employment agreement as BitPower Investment Partners, LLC either never existed and was ultimately formed under the name CryptoWatt Investment Partners, LLC, or it was renamed as CryptoWatt Investment Partners, LLC.

23.     Respondent Atlas Power, LLC is and at all material times was a Delaware limited liability company with its principal place of business located in Montana. On information and belief, Atlas Power, LLC was formed in 2019 by Washington.

24.     Respondent Atlas Power Holdings, LLC is and at all material times was a Delaware limited liability company with its principal place of business located in Montana.

25.     On information and belief, Atlas Power, LLC was formed in 2019 by Washington. On information and belief, CryptoWatt Mining, CryptoWatt Management, and CryptoWatt Investment Partners, LLC, were renamed, reformed under, and/or rebranded as, Atlas Power. Atlas Power is the successor in interest of CryptoWatt Mining, CryptoWatt Management, and/or CryptoWatt Investment Partners, LLC.

26.     Claimant is unaware of the true names and capacities of the remaining Respondents sued in this action by the fictitious names DOES 1 through 100. Claimant will amend his complaint when those names and/or capacities become known to Claimant. Claimant is informed and believes that each of the fictitiously named Respondents is in some manner responsible for the events and allegations set forth in this complaint.

27.     Respondents, and each of them, and DOES 1-100, were the agents, servants, employees, alter egos, independent contractors, co-conspirators, management companies, predecessors or successors in interest, and/or joint venturers of one another, and were at all times material hereto, acting within the authorized course, scope, and purpose of such relationships. All such acts were performed with knowledge, acquiescence, ratification and

STATEMENT OF CLAIM

consent of the respective managing agents and principals of each of the Respondents, and the benefits thereof accepted by such managing agents and principals.

28.     On information and belief the Respondents—namely BitPower, BitPower Management, BitPower Investment, CryptoWatt Investment, CryptoWatt Mining, CryptoWatt Management, and Atlas Power—acted in furtherance of a common scheme to defraud Claimant. Each of the foregoing limited liability companies were undercapitalized for purposes of corporate undertakings and these entities observed little or no corporate formalities. Upon information and belief, certain or all of the Respondents have or had during relevant times herein little or no corporate records.

## IV.   FACTS

### A.    The Bitcoin Industry

29.     Bitcoin, often described as a cryptocurrency, is a digital currency that is completely virtual.  Each bitcoin is basically a digital asset stored in a "digital wallet."  People can send bitcoins (or part of one) to a digital wallet, where the receipt and transaction is verified by bitcoin miners and datacenters, like the facility described in this case. The transaction is then recorded to a public ledger called a blockchain. The miners are rewarded with bitcoin (or transaction fees) for providing their services. Bitcoin networks (or nodes) are designed to verify transactions, to the blockchain ledger, through solving complicated equations and algorithms, which can be done at scale in large datacenters.

30.     Bitcoin is a completely decentralized digital currency.  The

STATEMENT OF CLAIM

Bitcoin economy has grown since it was first developed in 2009 into an economy that is larger than the economies of some of the world's smaller nations. The value of a Bitcoin has grown and fluctuated from pennies in its early days to more than $50,000 in 2021.

31. Traditional currencies are issued by central banks. The central bank can issue new units of money based on a variety of issues. Bitcoin differs from a central bank in that the issuance rate is set in the computer code thus preventing cheating of the system or the creation of bitcoins out of thin air.

32. Bitcoin are entirely digital tokens that do not require excavation or panning streams to extract gold or some other element or mineral. But Bitcoin does involve a form of prospecting and recovery and thus the nomenclature "mining" is used to explain the process. Bitcoin miners download and run mining software and often join a pool of other miners doing the same thing. Together or alone, the software compiles recent Bitcoin transactions into blocks and proves their validity by calculating a "proof of work," that covers all of the data in the blocks. That involves the mining hardware taking a huge number of guesses at a particular integer over and over until they find the correct one.

33. Bitcoin mining is a computationally intense process that is further hampered by deliberate increases in difficulty as more and more miners attempt to create the next block in the chain. This is one of the reasons that people join pools and why only the most powerful of application specific integrated circuit (ASIC) mining hardware is effective at mining bitcoins today.

STATEMENT OF CLAIM

34.     The individual miner or pool that is the first to create the proof of work for a block is rewarded with transaction fees for those confirmed transactions and a subsidy of bitcoins that are generated through the process of mining. This will continue to happen until all 21 million bitcoins have been mined. With Bitcoin, miners are rewarded about every 10 minutes.

35.     There is no guarantee that any one miner or mining pool will generate the correct integer needed to confirm a block and thereby earn the reward. Finding a block most closely resembles a type of network lottery. For each attempt to try and find a new block, which is basically a random guess for a lucky number, a miner has to spend a tiny amount of energy. Most of the attempts fail and a miner will have wasted that energy. Only once, generally about every ten minutes, will a miner succeed and thus add a new block to the blockchain.

36.     This also means that any time a miner finds a valid block, it must have statistically consumed much more energy for all the failed attempts. This "proof of work" is at the heart of Bitcoin's success.  Proof of work prevents miners from creating bitcoins out of thin air: they must consume real energy to earn them. And proof of work ossifies Bitcoin's history. If an attacker were to try and change a transaction that happened in the past, that attacker would have to redo all of the work that has been done since to catch up and establish the longest chain. This is practically impossible and is why miners are said to "secure" the Bitcoin network.

37.     In exchange for securing the network, and as the "lottery price" that serves as an incentive for burning this energy, each new block includes a special transaction. It is this transaction that awards the miner with new

STATEMENT OF CLAIM

bitcoins, which is how bitcoins first come into circulation. At Bitcoin's launch, each new block awarded the miner with 50 bitcoins, and this amount halves every four years: Currently each block includes 12.5 new bitcoins. Additionally, miners retain any mining fees that were attached to the transactions included in their blocks.

38.     Bitcoin mining is thus the backbone of the Bitcoin network. Miners essentially issue new bitcoins, confirm transactions and secure the network.  This is done using specialized computers that process every Bitcoin transaction by solving a computational mathematical problem that allows them to chain together blocks of transactions.

39.     Although technically anyone can become a Bitcoin miner, over the years, mining became increasingly specialized and is now largely done professionally by companies that are able to build large data centers supplied by relatively inexpensive electricity in a cool climate.  These corporate miners purchase a large amount of specialized computer hardware that runs 24/7 mining code to create Bitcoins.

**B.      Respondents' Plan to Build a Bitcoin Plant**

40.     In or around 2017, Burrell and Washington first began procuring Bitcoin mining equipment.  They met with Joby Weeks, a strong proponent of Bitcoin, with connections to, among other things, a mining pool network called BitClub Network. Weeks provided Burrell and Washington with information on how Respondents could enter the Bitcoin mining industry and after first agreeing to purchase equipment from Weeks and others, Burrell and Washington came upon the idea of building a plant to host Bitcoin

STATEMENT OF CLAIM

mining equipment but lacked the technical skills or ability to do so.  It was only as a result of discussions with Claimant that they realized that utilizing Claimant's services they could build and host a plant.  The concept was to build or find a facility in Montana to host the computer hardware necessary to mine Bitcoin with the intent to lease the facility to miners in exchange for a fee.  Weeks was originally to be a partner of Burrell and Washington in the Bitcoin plant.

41.    Burrell and Washington began to alter their plan as they continued to meet and discuss issues with Weeks. Ultimately, they decided to develop a facility that would host mining equipment and they decided that they too would purchase mining equipment so that they could themselves mine Bitcoin and benefit from the then-very high price of the currency.

42.    Burrell and Washington purchased Bitcoin mining machines from BitFury and BitMain.

43.    Integral to their plan was the need to locate someone who was capable of engineering and building the necessary mainframe to house the equipment, redesigning, if necessary, the facility, as well as someone with knowledge of the electrical requirements so as to ensure adequate wattage to run the mining equipment.  In addition, Burrell and Washington needed someone with the knowledge of electrical suppliers to negotiate the necessary agreements for electrical service.  Burrell and Washington were themselves neophytes in such areas and lacked the necessary expertise to get the plan off the ground.

44.    In or around October 2017, Weeks introduced Burrell to Claimant.  Certified as a Microsoft Systems Engineer, Claimant has a wealth

STATEMENT OF CLAIM

of experience in developing cross-infrastructure technology for big data applications. In 2014, Claimant co-founded the energy startup Chai Energy, which provides data analytics and big data application, in the real-time energy market and to utility customers. He is a much sought-after provider in the U.S. market for the design and development of technology tools and programs to power e-commerce, and has been at the forefront of the development and market application of behavioral energy efficiency technology. Claimant has an extensive background in technology and has all of the necessary skills to design and implement the Bitcoin plant. In addition, Claimant has experience dealing with electrical suppliers to negotiate agreements that would provide sufficient energy at a sustainable price.

45.     Initially, Claimant was courted by Weeks and Burrell to join the project. However, in early-December 2017, Burrell instructed Claimant to tell Weeks that Weeks was out of the project during a meeting at Washington's home in Los Angeles.

46.     Claimant was only interested in participating if his compensation would include an interest in the assets and revenue of the mining. Burrell and Washington assured Claimant that he would be compensated not only with a salary but that he would also receive a signing bonus and an interest in the company that was to be formed that would own the assets, including the mining equipment, and the ultimate profit earned by the company.

47.     During this period, Respondents were forecasting revenue for 2018 at approximately $112 million, 2019 at $712 million and gross profits for 2018 at $98 million and $645 million in 2019.

STATEMENT OF CLAIM

48.     Claimant commenced work shortly after the first meeting, which occurred on October 30, 2017.  In or around the middle of November, Claimant was informed that the entities that would be formed for the project would be called BitPower.

49.      Respondents were at the time looking to lease land next to an electrical substation in or around Anaconda, Montana and were planning on doing a "greenfield buildout."  However, in or around November 2017, Respondents heard that there was an abandoned electrical substation that was coming onto the market near Butte, Montana and they entered into negotiations to purchase the facility for the purpose of mining Bitcoin and hosting Bitcoin mining equipment.  The facility was an old electrical substation for MSE Technology Applications, Inc. – a 1970's joint venture between the federal government and a not-for-profit group to test "clean coal technology" that ultimately folded.  Respondents succeeded in acquiring the facility in or around early January 2018 for approximately $4.5 million.

50.     In the course of a few weeks in early November 2017, Claimant traveled to various countries including Malaysia, Australia and Republic of Georgia to look at other Bitcoin sites for purposes of researching the projects. Following that whirlwind tour, Claimant returned to the United States and engaged in meetings with Burrell and Washington who began negotiating certain terms for Claimant's ongoing work.  In or around November 2017, Claimant met with Respondents' representative at the substation facility in Butte, Montana to review the site and determine whether the site would be acceptable for the project.

STATEMENT OF CLAIM

51.    In addition, Claimant commenced work in conjunction with various contractors to engineer the site from an energy perspective and to structure the architecture for the placement of the servers and the racks so that the space could be optimized for operations.  He also was responsible for designing the configuration of the infrastructure for the servers. Respondents were forcing operations at a feverish pace.  They were demanding round the clock work from everyone in order to get the plant up and running. Respondents had, among other things, obtained financing, leveraging BDI and or its assets, and were determined to force the plant into operation within weeks.  At or around that time, Claimant suggested that Respondents retain contractors to assist in the development of the plant.  Fred Von Graf, who along with Claimant and Anthony Kosednar co-owned a technology company called TokenBlock, suggested that he and TokenBlock be retained to assist, given the pressure of work required to complete the plant build out. Von Graf suggested that he would work with the electrical engineers while Claimant focused on the general architecture and design.

52.    Ultimately, Claimant and Anthony Kosednar  worked on and designed the infrastructure for the server configuration and breaker systems. Von Graf was hired to work on procuring wires and cables and later on staffing for the site.

53.    Claimant and the lawyers retained by Respondents engaged in the negotiations with various energy companies for a power contract. Then, after the selection of the power company, Claimant and the lawyers negotiated the contract.  The electrical upgrade for the substation was to be accomplished by Barnard Construction. Rick Tabish became what was

18

STATEMENT OF CLAIM

essentially a general contractor on site.  Tabish also dealt with permitting locally as well as cleanup of the site when first purchased.  Burrell and Washington were directing all operations and contributing financially to the buildout either through cash or equipment.

54.    Neither Burrell nor Washington, nor anyone else associated with Respondents, had sufficient technical knowledge to build the plant and thus needed Claimant to accomplish their goal to build a Bitcoin plant that would be operational quickly and efficiently.

55.    Throughout the period from November to December 2017, Claimant spent countless hours working day and night to engineer the Bitcoin plant.  Among other things Claimant accomplished the following during this period: the negotiation of power contracts to run the plant, the complete design and buildout of the physical infrastructure for the servers, and the design and development of the internal portion of the plant so as to allow the operation to run efficiently.

56.    In or around early December 2017, Burrell and Washington purportedly formed BitPower to hold title to the facility and operate the Bitcoin plant.  Burrell and Washington represented to Claimant that ownership of the mining equipment would be placed in an entity entitled Tango & Cash or Bitpower Investment Partners (which, on information and belief, was later, formed as CryptoWatt Investment Partners), which were supposedly owned by Washington and Burrell.  In addition, Burrell and Washington formed BitPower Management as the holding company for BitPower.  Respondents represented to Claimant that he would be provided with an employment contract with BitPower that would provide him with an

STATEMENT OF CLAIM

annual salary, a signing bonus, and shares of the profits realized from the operation of the plant.  The signing bonus was intended to act as payment for services provided in November and December of 2017.

57.     Throughout November and the beginning of December 2017, Claimant repeatedly asked Burrell to provide him with the promised employment contract. Respondents repeatedly assured Claimant that the agreement would be forthcoming.  In reliance on those assurances, Claimant continued to provide services critical to the development of the Bitcoin plant.

58.     Although Claimant repeatedly asked for a written agreement, the Respondents ignored his requests.  Ultimately the Respondents revised and modified a form agreement that Claimant had submitted to them in mid-December 2017.  But the Respondents made changes that were not consistent with the parties' oral agreement.  Instead, Burrell presented Claimant with a written agreement dated December 31, 2017 (the "December 31 Agreement"), that referenced a start date of December 31, 2017 – even though Claimant had by then provided hundreds of hours of work on the project. Burrell made clear that the December 31 Agreement was a "take it or leave it." Moreover, Burrell falsely represented to Claimant that Claimant would receive more from the operations of the business under the December 31 Agreement, claiming that the Respondents were planning on an Initial Public Offering.

59.     The December 31 Agreement provided Claimant with a base salary of $240,000 per year for which Respondents were to be responsible for payroll deductions and all required withholdings; a signing bonus of $100,000 "upon the successful installation of the first order;" options of "8% shares of the Membership Units made up of BitPower LLC which will vest

STATEMENT OF CLAIM

immediately upon execution"; and 5% of "Tango and Cash investments or BitPower Investment Partners ('InvestCo') or investments in Bitcoin mining equipment, services or programs or distributions paid back after the principal investment is made up from the initial investment."  The latter provision was to provide Claimant with an ownership interest in the BitFury and BitMain equipment that Burrell and Washington had purchased.

60.    On information and belief, BitPower Investment Partners (the entity the Agreement referred to as "Investco") was ultimately formed as CryptoWatt Investment Partners, after Respondents rebranded BitPower as CryptoWatt.

61.    The December 31 Agreement was purportedly between Claimant and BitPower, LLC, which was supposed to have been formed for the purpose of operating the Bitcoin plant.  The "Membership Unit Awards" identified in the agreement were subject to and in accordance with an operating agreement of BitPower and BitPower Investment Partners.  Although Claimant requested a copy of the operating agreement, Burrell and Washington did not provide one. To this date, Claimant has never received a copy of the operating agreement of BitPower/Crypt Mining, BitPower Investment Partners/CryptoWatt Ivestment Partners, and/or Atlas Power that included his ownership shares.  However, Claimant was repeatedly assured that his ownership interest had been properly documented in that operating agreement.

62.    Respondents told Claimant that the Agreement was "take it or leave it."  By then, Claimant had invested a significant amount of time in the project and he had yet to be paid any money for his services.  Forced to accept

the Agreement, Claimant signed the December 31 Agreement with the understanding that he would be paid for all work he performed both prior to and after execution of the agreement.

63.    Claimant continued to invest a significant amount of his time and energy into the development of the Bitcoin plant.  Throughout the period from January 2018 to February 2018, Claimant worked day and night.  The Respondents were driving hard to have the Bitcoin plant up and running by the end of February 2018.  Claimant's services were integral to the accomplishment of that goal, and Claimant continued working for Respondents through April 3, 2018.

64.    Unknown to Claimant, after he brought Von Graf in to assist with the project, the Respondents and Von Graf began discussions which were aimed at cutting Claimant out of the ongoing running of the Bitcoin plant.

65.    In or around January 2018, Claimant was informed that that amendments were made to the corporate documents forming BitPower to change the name to CryptoWatt Mining and further to change the name of BitPower Management to CryptoWatt Management.  Claimant was unaware that the Respondents were also forming other companies. On information and belief, this was done to divert funds away from the entities in which Claimant purportedly held an ownership interest and to hide his ownership.

66.    On or about January 26, 2018, Claimant was first informed by Burrell that Claimant's membership units were never included in the operating agreements as required by the December 31 Agreement.  Burrell told Claimant this would be done, however, and that an amended agreement

STATEMENT OF CLAIM

would be prepared.  In an email dated January 26, 2018, Claimant wrote to John Fullerton of BDI, cc'ing Burrell: "Can you send me the CryptoWatt and Host Co operating agreements that Kevin signed?  In addition, I just got off the phone with Dan and it sounds like we didn't include my member units in the first agreement.  He recommended we put together an amended agreement with my member units respectively."

67.   Mr. Fullerton wrote back to Claimant on January 26, 2018 the following: "Evan:  Please find the executed CryptoWatt Management, LLC and CryptoWatt, LLC operating agreements attached.  Kevin only signs the Management level.  The HostcoLLC Agreement has not been finalized and will be signed by BMH and CryptoWatt.  I will need direction as to your units as it has always been communicated as 50/50.  Will these units be in CryptoWatt Management LLC?"  In response Claimant wrote: "8% of CryptoWatt, And 5% of investments after capital repayment out of the T&C / investment co." And, Mr. Fullerton wrote back "Understood, that will not be too difficult to amend."

68.   In reliance on the foregoing, Claimant understood that his interests were adequately documented confirming his interests in CryptoWatt and the T&C investment company.  Unknown to Claimant, his interests were never documented and the Respondents have refused to acknowledge his interests or to pay Claimant any of the funds due to him.

69.   In addition to all of his work in November and December 2017, Claimant worked tirelessly throughout January and February 2018 and ultimately as a result of his efforts, the Bitcoin plant successfully came on line the last week of February 2018/first week of March.  Prior to or at that

STATEMENT OF CLAIM

time, there were numerous orders that had been placed clearly satisfying the provision in the December 31 Agreement that Claimant be paid a "signing bonus of $100,000 [] upon the successful installation of the first order."

70.     After the Respondents knew that the plant would be operational, the Respondents suddenly and without warning forced Claimant off the Bitcoin plant. Claimant continued to work, from Los Angeles, on the Bitcoin plant's website and on branding and business development. He was told that his separation from the plant was only temporary. About 30 days later, however, on April 3, 2018, Respondents terminated Claimants' contract.

71.     At the time of his termination, the Respondents had only paid Claimant a total of $40,000, although he was owed far more, including, but not limited to, the $100,000 signing bonus and the salary owed for his work through April 3, 2018 – the date that the Respondents represented his employment was contractually concluded.  Further, the Respondents failed entirely to make payments in accordance with the terms of the December 31 Agreement which required that Respondents pay Claimant his salary less applicable payroll deductions and to make all required withholdings.  The Respondents did not pay Claimant for the work that he performed from October to December 2017, or for March 2018.  Nor have Respondents compensated Claimant for any of the ownership interests he was due from CryptoWatt Mining or the interest in T&C.

STATEMENT OF CLAIM

## FIRST CAUSE OF ACTION

## (Breach of Contract as to Respondents, and DOES 1 through 50)

72.    Claimant incorporates by reference all prior allegations above, as if fully set forth herein.

73.    At all times material hereto, there existed as between Claimant and Respondents, an agreement whereby Respondents promised to pay Claimant for his services in accordance with the terms of the December 31 Agreement. Among other things, the terms of the agreement required that Respondents pay Claimant an annual salary less applicable payroll deductions and all required withholdings in bi-weekly installments, a signing bonus of $100,000 upon successful installation of the first order; and options for 8% shares of the Membership Units made up of BitPower; 5% of investments in Bitcoin mining equipment, services or programs or distributions paid back after the principal investment is made up from the initial investment. A true and correct copy of the December 31, 2017 Agreement is attached hereto as **Exhibit 1**.

74.    Agreement terms were on a take it or leave it basis. Claimant continually requested an agreement from the moment that he commenced providing services to Respondents in or around November 2017 and Respondents continually promised him an agreement.  In reliance on and in consideration of Respondents' promises, Claimant commenced working on the Bitcoin plant and by December 31, 2017, had provided extensive services for which he had not been paid.  Claimant had no option but to sign the Agreement when Respondents provided it to him on December 31 in order to ensure that he was paid for the services that he had rendered.

25

75.    Claimant was effectively forced to execute the Agreement on December 31, 2017 in order to ensure that he received payment for the services that he had provided and to receive the benefits that he had been promised.  At all times material hereto, Claimant performed all obligations that he was required to perform under the December 31 Agreement. Claimant engineered, built, and completed the Bitcoin plant which became operational in or around late-February or early-March 2018.

76.    At all times Claimant fully satisfied all the terms of his Employment Agreement and did nothing to justify Respondents terminating him for "cause" as defined in the agreement and Claimant did not resign (nor was he terminated) for "good reason."  Rather, Respondents unilaterally and without cause terminated Claimant on or about April 3, 2018, and thereafter sought to force him to sign another agreement to rescind the December 31 Agreement.  The "Rescission Agreement and Mutual Release" ("Rescission Agreement"), incorrectly stated that the December 31 Agreement "contains material mistakes and errors" and that the December 31 Agreement was "not in accord with the parties' common intention" and that the employment relationship allegedly never commenced.  Further, Respondents sought to force Claimant to sign the Rescission Agreement which also incorrectly stated that Claimant had received all payments and benefits owed to him so as to obtain a release by Claimant of all his claims against the Respondents.  Claimant refused to sign the Rescission Agreement even though Burrell told him he would "rip [Claimant's] head off if he didn't sign" the Rescission Agreement.  To date, Claimant has never signed the Rescission Agreement.

77.     Respondents breached the December 31 Agreement by failing to pay Claimant for his services, including failing to pay Claimant the $100,000 signing bonus, failing to pay his full wages, and failing to provide options for 8% shares of Membership Units of CryptoWatt and 5% of CryptoWatt Investment or investments (renamed or reformed as Atlas Power) in Bitcoin mining equipment, services or programs or distributions as described above.  Moreover, Respondents failed to pay the necessary withholdings for taxes with respect to the limited payments they made to Claimant, as they were contractually required to do.

78.     As a result of Respondents' breach, Claimant has been damaged in an amount of at least $36,520,000.

79.     Claimant further seeks all other relief recoverable by law or equity.

## SECOND CAUSE OF ACTION

### (Breach of the Implied Covenant of Good Faith & Fair Dealing as to Respondents and DOES 1 through 50)

80.     Claimant incorporates by reference all prior allegations in paragraphs 1 through 67 as if fully set forth herein.

81.     Both parties to an employment relationship have a duty not to do anything that prevents the other party from receiving the benefits of their agreement. Good faith means honesty and observing reasonable standards of fair dealing.  Generally speaking, this means being faithful to one's duty or obligation.

STATEMENT OF CLAIM

82.     Claimant and Respondents entered into a written employment contract and Claimant substantially performed all of the duties required of him under the contract.

83.     Respondents promised Claimant that they would provide him with a salary, signing bonus, options of shares of Membership Units and a percentage of the investments as described above.  Despite making this written promise, Respondents have and continue to fail to pay Claimant the signing bonus, salary owed to Claimant, the options or the percentage of investments as described above.

84.     Respondents, at all relevant times, gave Claimant reasonable cause to believe he would be treated fairly, and that they would comply in good faith with the terms of the agreement. Respondents, however, failed to act fairly and in good faith and to comply with the terms of the contract.

85.     Further, Claimant is informed and believes and thereon alleges that Respondents engaged in a course of conduct that was intended to oppress and dissuade Claimant from seeking the benefits due to him under the contract, including by demanding that Claimant sign a "rescission agreement" that would effectively have rescinded the December 31 Agreement.

86.     Respondents have refused to fulfill their obligations under the December 31 Agreement and their refusal has been done with a conscious disregard for the rights of Claimant. These acts were done with the knowledge and approval and ratification of Respondents and each of them and each of their officers, directors and other managing employees.

STATEMENT OF CLAIM

87.     As a direct and proximate result of the aforementioned unreasonable and bad faith conduct of Respondents, Claimant has suffered, and will continue to suffer in the future, damages, plus interest, and other economic and consequential damages, for a total of at at least $36,520,000.

88.     Plaintiff further seeks all other relief recoverable by law or equity.

## THIRD CAUSE OF ACTION

### (For Fraud as to Respondents and DOES 1 through 50)

89.      Claimant incorporates by reference all prior allegations in paragraphs 1 through 67 as if fully set forth herein.

90.     Respondents deliberately made false and misleading statements to Claimant that they would pay him for his services and further that they would ensure that he receive a bonus, options of Membership Units, revenues from mining equipment, and a percentage of the profits of the Bitcoin plant. At the time that Respondents made those statements they knew that they were false.

91.     Respondents intended to induce and did induce Claimant to rely on their misrepresentations so that Claimant would expend extensive efforts and work necessary to design and develop the Bitcoin plant and to get the plant up and running.  Moreover, Respondents knew that Claimant would rely on the false and misleading statements in working to engineer, design and complete the plant.

92.     Unaware that Respondents had embarked upon the scheme to obtain the benefits of Claimant's work on the Bitcoin plant without any

STATEMENT OF CLAIM

intention to pay him, Claimant justifiably and detrimentally relied on Respondents' false and misleading statements and thus was induced into providing extensive services that led to the completion and operation of the Bitcoin plant.

93.    Had Claimant known the true facts regarding the Respondents' scheme and false intentions, Claimant would not have worked on the Bitcoin plant and would have declined to expend time and money assisting in the development of the plant.

94.    As a direct and proximate result of Respondents' fraudulent misrepresentations, Claimant has suffered injury and substantial damage in an amount estimated to be well in excess of $36,520,000.

95.    Plaintiff further seeks all other relief recoverable by law or equity.

96.    Respondents' fraudulent conduct was undertaken with a conscious disregard of the rights and interests of Claimant, and for the purpose of enriching themselves and jeopardizing Claimant's financial well-being.  In making the foregoing material misrepresentations, omissions of material fact and in undertaking the foregoing wrongful acts, Respondents acted with actual fraud and malicious, with the intent to defraud Claimant.

## **FOURTH CAUSE OF ACTION**

### **(For Negligent Misrepresentation Against Respondents and Does 1-50)**

97.    Claimant realleges and incorporates by all prior allegations in paragraphs 1 through 67 except for those stated in the prior cause of action, as though fully stated herein.

STATEMENT OF CLAIM

98.   Throughout the period from November 2017 through April 3 2018, Respondents made representations to Claimant regarding the benefits that he would earn by providing services for the development of the Bitcoin plant.

99.   Respondents recklessly and/or negligently made the above-referenced false and misleading statements without reasonable grounds for believing them to be true.

100.   Respondents intended to induce Claimant to rely on the foregoing statements and/or representations, and/or Respondents knew that Claimant would rely on the foregoing statements and/or representations in making decisions to continue to work to build the Bitcoin plant.

101.   Claimant justifiably relied on Respondents' statements to his detriment and wase induced to work on the plant and forego other employment.

102.   Had Claimants known the truth regarding the Respondents' scheme, Claimant would not have agreed to provide any services, nor would he have worked to develop the Bitcoin plant.

103.   As a direct and proximate result of Respondents' negligent misrepresentations and/or omissions, Claimant has suffered injury and substantial damage in an amount estimated to be at least $36,520,000.

104.    Plaintiff further seeks all other relief recoverable by law or equity.

STATEMENT OF CLAIM

## FIFTH CAUSE OF ACTION

## (For Recovery of Unpaid Wages Against Respondents and Does 1-50)

105.   Claimant incorporates herein and by reference each and every allegation in paragraphs 1 through 67 above as if fully set forth herein.

106.   Pursuant to the December 31, 2017 Agreement between Claimant and the Respondents, the Respondents are required to pay Claimant for his services in designing and building the Bitcoin plant in accordance with the December 31 Agreement.

107.   In addition, Claimant is entitled to compensation and other amounts specified in the December 31 Agreement.

108.   Effective as of April 3, 2018, Respondents gave notice that they were terminating Claimant's services.

109.   As of the effective date of his termination, Respondents had only paid Claimant $40,000 and failed and refused to pay any of the additional amounts due to him for his work on the Bitcoin plant in accordance with the December 31 Agreement.

110.   Respondents' failure to pay the full amount due to Claimant on termination violates the provisions of applicable law.

111.   There is now substantial wages and compensation due and owing to Claimant. Claimant was not paid for his work in October and November 2017 for his last month of work in 2018 and, in addition, he was not paid other compensation to which he was entitled under the terms of his employment. Respondents have failed and refused, and continue to fail and refuse, to pay Claimant's wages and compensation.

STATEMENT OF CLAIM

112. Pursuant to applicable law, Claimant requests the Court award Claimant wages and compensation and, among other thing, costs, penalties, interest, and any other available relief for Respondents' willful failure to pay wages of an employee, as allowed by applicable law.

113. Claimant further seeks all other damages recoverable by law or equity.

## SIXTH CAUSE OF ACTION
## PUNITIVE DAMAGES

114. Claimant incorporates herein and by reference each and every allegation in the paragraphs above as if fully set forth herein.

115. Under applicable law, Respondents' conduct constitutes oppression, actual fraud, and actual malice, and Claimant is entitled to reasonable exemplary and punitive damages in an amount sufficient to make an example of Defendants.

## **PRAYER FOR RELIEF**

Wherefore, Claimant respectfully requests that the Court enter judgment in his favor and against Respondents as follows:

a. Awarding Claimant damages, as set forth herein;

b. Awarding Claimant pre-judgment and post-judgment interest as provided by law;

c. For reasonable punitive damages in an amount to be proven;

d. Awarding Claimant fines and penalties and other relief available in accordance with applicable law;

e. Awarding Claimant costs of this Arbitration; and

f.  Awarding Claimant such other and further relief as may be just and proper by law or equity.

DATED: April 1, 2021                 RESPECTFULLY SUBMITTED,

William A. Rossbach
ROSSBACH LAW, P.C.

Gretchen M. Nelson (PHV pending)
Gabriel S. Barenfeld (PHV pending)
NELSON & FRAENKEL LLP

Jules G. Radcliff, Jr. (PHV pending)
RADCLIFF & MAYES LLP

By:  /s/ *William A. Rossbach*
William A. Rossbach
*Attorneys for Claimant Evan Birenbaum*

STATEMENT OF CLAIM

# **EXHIBIT 1**

**PRIVATE AND CONFIDENTIAL**

Date: December 31, 2017

Evan Birenbaum
4213 Scandia Way
Los Angeles, CA 90013

Dear Evan,

On behalf of BitPower LLC. ("Company") and its management team, I am delighted to offer you the position of Chief Operating Officer.  This offer of employment is conditioned upon the receipt of proof of your legal eligibility to work in the United States, and other conditions stated below.  This letter embodies the terms of our offer to you:

1.     **Position:** Chief Operating Officer

2.     **Initial Reporting Relationship:** You will report to the Chief Executive Officer of the Company.

3.     **Location:** Butte, Montana. Aspen, Colorado.

4.     **Start Date:** December 31, 2017

5.     **Salary:** As approved by the Board of Directors of the Company ("Board"), your base salary will be $240,000 per annum. In each case, your salary will be paid, less applicable payroll deductions and all required withholdings, in bi-weekly installments (or such other regular payroll period of the Company) in accordance with the Company's standard payroll practices for salaried employees.

6.     **Membership Unit Awards:**  You will be granted units of the LLC's Membership Units of the Company ("Membership Units") under the Company's Equity Incentive Plan as follows:

   - Options are granted to comprise of 8% shares of the Membership Units made up of BitPower LLC ("HostCo), which will vest immediately upon execution of this contract.
   - 5% of "Tango and Cash" investments or BitPower Investment Partners ("InvestCo") or investments in bitcoin mining equipment, services or programs or distributions paid back after the principal investment is made up from the initial investment.
   - Signing bonus of $100,000 paid upon the successful installation of the first order.

   These Membership Unit Awards (a) are subject to and in accordance with the BitPower LLC and BitPower Investment Partners operating agreement or "Tango and Cash" investments, services, programs and mining equipment, (b) can be transferred to family members and trusts as stated in companies operating agreement.

   In the event of a Change of Control and termination with or without cause or for good reason, the following will apply with respect to the Membership Unit Awards:

   (i) if your employment is terminated without Cause (as defined below) by Company (or a successor, if appropriate) or you resign for Good Reason (as defined below) in connection with or within twelve (12) months following the consummation of a Change of Control or other employment changes, then one hundred percent (100%) of the unvested Membership Units shall vest effective immediately upon the termination or change of your employment.

As used herein, the following terms will have the following meanings:

"Cause" means any of the following: (A) conviction or plea of nolo contendere of any felony or any crime involving moral turpitude or dishonesty; (B) fraud, dishonesty or misuse of Company's funds or other Company resources to your benefit; (C) demonstrated and material neglect of duties; (D) intentional and willful refusal to follow lawful directives of the Board and/or Chief Executive Officer; (E) willful commission of any material violation of any state or federal laws relating to the workplace environment or (F) the use of alcohol or illegal drugs, materially interfering with the performance of your employment obligations.  Any termination pursuant to subsection (C) herein requires that Company provide you a reasonable opportunity, of not less than ten (10) days, to cure the basis of the alleged Cause.

"Good Reason" means any one of the following:  (A) assignment to you of duties and responsibilities that are materially less than or otherwise not in keeping with your then current duties and responsibilities, (B) a significant reduction in your base salary (except as part of a general change in base salary for all similarly situated executives); (C) relocation of your principal work location to a location more than a fifty (50) mile radius of your principal work location; or (D) by mutual agreement between Company and you.

7. **Initial Responsibilities**: Your initial responsibilities will include the following:

- Collaborate with the Company's leadership team on task prioritization and activities;
- Work with the Company's leadership team on regular briefings, updates on work progress, and overall company performance, etc.;
- Lead and support the Company's (a) operations and compliance; (b) overall success of the Company's goals and objectives; and (c) overall business strategy and day-to-day operations;
- Participate in investment discussions related to BitPower LLC and "Tango and Cash" business, business strategy, or programs and services;
- Lead and support the Company's overall platform strategy and market expansion efforts, business operations; and
- Other responsibilities as assigned.

8. **Paid Time Off:** In addition to federal and Montana state holidays for which you will be entitled to paid time off, you will be entitled to up to ten (10) days of paid time off per calendar year (pro-rated based on your actual start date).

9. **Benefits:** You are eligible to participate in benefits consistent with the Company's policies, including medical, dental and vision.  You will also be eligible to participate in benefits provided to other executives of the Company.  Lastly, you will also be eligible to participate in the Company's 401(k) and other benefits if, when and as implemented by the Company.

10. **Period of Employment:**  Your employment with the Company will be "at will," meaning that either you or the Company can terminate your employment at any time and for any reason, with or without cause. Any contrary representations which may have been made to you are superseded by this offer. This is the full and complete agreement between you and the Company on this term.  Although your job duties, title, compensation and benefits, as well as the Company's personnel policies and procedures, may change from time to time, the "at will" nature of your employment may only be changed in an express written agreement signed by you and a duly authorized officer of the Company.  You and the Company agree to provide the other party at least thirty (30) days prior notice of any termination of or resignation from employment, as the case may be.

11. **Reference Checks:** Your offer is contingent upon the satisfactory completion of reference checks.  Upon accepting this offer, you are authorizing the Company to contact your references. We may request additional information from you to engage in a background check as well.

12.   **Previous Employment:** Your offer is also contingent upon your certification that there are no contractual conditions that will prevent you from performing the responsibilities of this offered position.  Having left your former employer, it is expected that you did not take any of your former employer's (a) files, (b) clients or customer files or lists, (c) vendor, contractor or consultant files or lists; (d) employee files or any other property (including confidential information or trade secrets) that belongs to your previous employer.  If you took any of these types of files from your former employer, then it is required that you return them to your former employer immediately and before accepting this offer.

Furthermore, it is expected that when you left your former employer, if you had a non-solicitation agreement with that employer, that you did not (x) initiate contact or solicit your former employer's clients, or customers for the purpose of encouraging them to terminate their relationship with your former employer, (y) initiate contact or solicit your former employer's vendors, contractors, or consultants for the purpose of encouraging them to terminate their relationship with your former employer and (z) initiate contact or solicit your former employer's employees for the purpose of encouraging them to terminate their employment with your former employer.

We also expect that coming to work for the Company you will not violate any Employment Agreement, Confidentiality Agreement, Covenant Not to Compete Agreement, or other agreement between you and any of your former employers. By signing below, you confirm that you are not in violation of any agreement or contract with any former employer.

13.   **Amendment and Governing Law:**  This letter may not be amended or modified except by an express written agreement signed by you and a duly authorized officer of the Company.  The terms of this offer letter and the resolution of any disputes will be governed by the laws of the State of Montana, without giving effect to conflict of laws principles.  Any action relating to this offer letter must be brought in the federal or state courts having jurisdiction and venue in or for the courts located in Missoula County, State of Montana, and the parties irrevocably consent to the jurisdiction of such courts.

14.   **Entire Agreement:**  This letter and the Confidential Information and Invention Assignment Agreement attached hereto contain all of the terms of your employment with the Company and supersede any prior or contemporaneous understandings or agreements, whether oral or written, between you and the Company.

15.   **Arbitration:** You and the Company shall submit to mandatory and exclusive binding arbitration of any controversy or claim arising out of, or relating to, this agreement or any breach of this letter.  Such arbitration shall held in the State of Montana, Missoula County, before a single neutral arbitrator, in accordance with the National Rules for the Resolution of Employment Disputes of the American Arbitration Association in effect at that time.

Prior to signing below, it is recommended that you consult with your own legal and other advisors concerning the matters set forth in this offer letter since it deals with important legal, financial and tax matters.

We hope that you find the foregoing terms acceptable. Please indicate your agreement with these terms and accept this offer by signing and dating both this letter and the enclosed Confidential Information and Invention Assignment Agreement and returning them to me.

This offer, if not accepted, will expire at 5:00 p.m. (Mountain time) on Friday, January 31, 2018.  Should you have any questions, please do not hesitate to call me at (443) 799-2259.

BitPower LLC. CONFIDENTIAL

Sincerely,

By:  Dan Burrell, CEO


The undersigned accepts the above employment offer and agrees that it contains the terms of employment with BitPower LLC and that there are no other terms express or implied.

By: _____          Dated: ___12/31/2017_____
Name:  Evan Birenbaum

**PROOF OF SERVICE**

**COUNTY OF LOS ANGELES**     )
                                                     )
**STATE OF CALIFORNIA**          )

I, the undersigned, declare:

I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action; my business address is 601 So. Figueroa Street, Suite 2050, Los Angeles, California 90017.  On April 1, 2021, I caused to be served the foregoing document(s)

**STATEMENT OF CLAIM AND DEMAND FOR ARBITRATION**

On the interested parties in this action by placing true copies thereof addressed as follows:

___x___   BY U.S. MAIL:
I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing.  Under that practice, it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid at Los Angeles, California in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

_____   BY PERSONAL SERVICE:
I caused to be delivered such envelope by hand to the offices of the addressee:


_____   BY FEDERAL EXPRESS OR OVERNIGHT COURIER

___x___   BY ELECTRONIC MAIL:
I caused to be delivered via electronic mail at the addresses listed below:

_____   BY TELECOPIER:
I served by facsimile at the numbers identified on the service list:

___X___   (STATE) I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on Thursday, April 01, 2021 at Los Angeles, California.


_____Karina Torres_____                          *Karina Torres*
(Print or Type Name)                                          (Signature)

## SERVICE LIST

*Birenbaum v. Cryptowatt Mining LLC, et al.*
**Case No. 01-21-0002-5535**

| | |
|---|---|
| Gretchen M. Nelson<br>Gabriel S. Barenfeld<br>NELSON & FRAENKEL LLP<br>601 So. Figueroa Street, Suite 2050<br>Los Angeles, CA 90017<br>Telephone: (213) 622-6469<br>Fax: (213) 622-6019<br>Email: gnelson@nflawfirm.com<br>Email: gbarenfeld@nflawfirm.com<br><br><br>Jules G. Radcliff Jr.<br>RADCLIFF MAYES LLP<br>515 S. Flower St., 18th Floor<br>Los Angeles, California 90071<br>Telephone: (213) 788-5336<br>Email: Jradcliff@radcliffmayes.com<br><br>William A. Rossbach<br>ROSSBACH LAW P.C.<br>401 North Washington St.<br>Missoula, MT 59807-8999<br>Telephone: (406) 543-5156<br>bill@rossbachlaw.com | *Attorneys for/Claimant* |
| Jerry S. Phillips<br>LOEB & LOEB<br>10100 Santa Monica Blvd., Suite 2200<br>Los Angeles, CA 90067<br>Telephone: (310) 282-2177<br>Fax: (310) 919-3961<br>Email: jphillips@loeb.com | *Attorney for Respondent* |

PROOF OF SERVICE